**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ZACHARY CARL ROTH, SR.  et al,

     Plaintiffs,

v.                                                                                   Case No. 1:19-cv-02179

ISLAMIC REPUBLIC OF IRAN,

     Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR DEFAULT JUDGMENT**

Plaintiffs come now before this Court, and in response to issues and questions raised at

the January 24, 2022,[1] hearing and outlined in the subsequent Order dated February 7, 2022

[Doc. #88], provide the following facts and argument in support of the entry

of default judgment against the Islamic Republic of Iran ("Iran"):   Plaintiffs incorporate by

reference, herein, all the supporting documents included in a binder submitted to the court on

May 24, 2021.  See **Attachment A.**

**UNDISPUTED EVIDENCE AND JUDICIAL NOTICE**

The FSIA "begins with a presumption of immunity" for a foreign sovereign.  *Bell*

*Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

Thus, "[t]he plaintiff bears an initial burden of production to show an exception to immunity,

such as § 1605A, applies."  *Owens v. Republic of Sudan, 864 F.3d 751*, 784 *(D.C. Cir. 2017)*.

Once that burden is met, "the sovereign bears the ultimate burden of persuasion to show the

exception does not apply," *Bell Helicopter Textron,* 734 F.3d at 1183, by a preponderance of the

---

[1] Plaintiffs' expert Michael Pregent requested additional time to supplement his original Report.  As a result, Plaintiffs' counsel retained the assistance of QRF, a consulting firm with military and intelligence consultants.  QRF provided supplemental information on certain attacks, including pre-redacted Wikileak reports, which assisted Mr. Pregent in verifying and disqualifying attacks and attributions.  See **Attachment B**, p. 72 and 103.

evidence.  *See Simon v. Republic of Hungary*, 812 F.3d 127, 147 (D.C. Cir. 2016).  "Therefore, if a plaintiff satisfies his burden of production and the defendant fails to present any evidence in rebuttal, then jurisdiction attaches."  *Owens*, 864 F.3d at 784.

In FSIA cases, such as this one, involving defaulting defendants, the D.C. Circuit view the applicable evidentiary standards as follows:

As far as the defaulting sovereign is concerned, the FSIA requires only that a plaintiff "establish [] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  This standard is mimics a provision in Federal Rule of Civil Procedure 55(d) governing default judgments against the U.S. Government.  Neither § 1608(e) and Rule 55(d) "relieves the sovereign from the duty to defend cases."  *Id.*  Moreover, § 1608(e) does not "require the court to demand more or different evidence than it would ordinarily receive," [] indeed, "the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Id*. at 785 (internal citations omitted).  "This lenient standard is particularly appropriate for [an] FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* That is why "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Id.* at 785-86.

Moreover, "plaintiffs [may] prove their claims using evidence that might not be admissible in a trial." *Id.* at 785 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding)); *see also Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d

238, 242 (2d Cir. 1994) (a court may conduct an evidentiary hearing to evaluate a plaintiff's evidence, but FSIA § 1608(e) "does not actually demand a hearing or live testimony; it demands evidence.").  Plaintiffs' evidence may be submitted without a hearing.  *Owens*, 864 F.3d at 788-789 ("As long as the evidence itself is admissible, as expert testimony certainly may be, and the court finds it satisfactory, its form or type is irrelevant … [t]herefore the plaintiffs' 'failure' to present eyewitness testimony or other direct evidence is of no moment as to whether they have satisfied their burden of production."); *see also Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 280 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017) ("[FSIA § 1608(e)] … does not actually demand a hearing or live testimony; it demands evidence.... Courts have accordingly recognized that FSIA plaintiffs seeking a default judgment can proceed by affidavit." (internal citations omitted)); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006) ("In evaluating plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence.... Plaintiffs' evidence may take the form of sworn affidavits." (internal citations and quotation marks omitted)).

Furthermore, a court can and should take judicial notice of any fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Accordingly, this Court "may take judicial notice of related proceedings and records in cases before the same court." *Brewer*, 664 F. Supp. 2d at 54 (quoting *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d. 229, 267 (D.D.C. 2006)).  Indeed, "the FSIA does not require this Court to re-litigate issues that have already been settled" in previous decisions. *Id.* at 54. "Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Valore*, 700 F. Supp. 2d at 60.  *See also, Stethem v. Islamic*

*Republic of Iran, 201 F. Supp. 2d 78 (D.D.C. 2002)* and *Allan v. Islamic Republic of Iran, No. 1:17-cv-00338 (RJL), 2019 WL 2185037 (D.D.C. May 21, 2019)*.  (In *Allan*, Judge granted nearly identical request to take judicial notice of evidentiary record in *Stethem*.)

These principles should guide this Court's review of Plaintiff's evidence which is more than sufficient to prove those elements of Plaintiffs' claims that FSIA §1605A requires to establish this Court's subject matter jurisdiction.

Moreover, Plaintiffs also advise the Court that Judge John D. Bates in *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB held an extensive hearing on Iran's material support to the Taliban in Afghanistan in October of 2021.  Plaintiffs request that the Court take judicial notice of those findings pursuant to Federal Rule of Evidence 201(b).  Plaintiffs also advise the Court of another recent decision in this District, holding Iran and the Islamic Revolutionary Guard Corps ("IRGC") liable for two terrorist attacks committed in 2015 and 2018 by the Taliban in Kabul, Afghanistan.  *Selig v. Islamic Republic of Iran*, 2021 WL 5446870, ---- F.Supp.3d ---- (D.D.C. November 22, 2021).  Plaintiffs request that the Court take judicial notice of those findings pursuant to Federal Rule of Evidence 201(b).

## FACTS

### I.   BACKGROUND

#### a.  <u>Iran's Role in the Region</u>

In 1979, the Supreme Leader of Iran established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran."  *Lee*, 2021 WL 325958, at *3.  Over the years, Iran built up combat forces composed of religious extremists and created "a fully functional

militia backed by the Islamic Revolutionary Guard Corps-Qods Force" ("Qods Force").[2] *Lee*,

2021 WL 325958, at *3.  To preserve the ideals of the Islamic Republic, the Qods Force supports

militias beyond its borders.  *Frost*, 383 F. Supp. 3d at 39.  Iran, of course, borders Iraq,

Afghanistan, and Pakistan.  Among other responsibilities, the Qods Force is charged with

"cultivating and supporting pro-Iran proxies" in foreign countries and coordinating with these

militant groups to conduct terrorist attacks. *Fritz*, 320 F. Supp. 3d at 59.  The Qods Force "trains,

advises and logistically supports terrorist and insurgent movements, and performs related

clandestine and covert special operation activities, on behalf of the Iranian government." *Lee*,

2021 WL 325958, at *3.  The Qods Force is responsible to and directed by the Supreme Leader

of Iran.  *Frost*, 383 F. Supp. 3d at 39.

     In the early 1980s, a loose network of Shia militias seeking to transform Lebanon into an

Islamic republic formed Hezbollah.  *Fritz*, 320 F. Supp. 3d at 60.  Iran and the IRGC were

"provid[ing] critical assistance to newly emerging Hezbollah, which swore an oath of fealty to

Iran." *Lee*, 2021 WL 325958, at *4. In exchange for Hezbollah's unwavering dedication to Iran

and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah." *Lee*, 2021 WL

325958, at *4.  Hezbollah acts mainly at the direction of Iran.  *Frost*, 383 F. Supp. 3d at 39.

"Iran provides Hezbollah with as much as $700 million–$1 billion per year" in the form of cash,

training, intelligence, and weapons. *Fritz*, 320 F. Supp. 3d at 60. Hezbollah envisions itself as

"the sharp end of the spear [,] going where Iran tells it to go in defense of ... Shia [Muslims]

around the world." *Fritz*, 320 F. Supp. 3d at 60.  Indeed, Hezbollah has committed numerous

terrorist attacks on Americans at the behest of Iran. *Fritz*, 320 F. Supp. 3d at 60.

     By the early 1990s, Hezbollah started to train al-Qaeda on its tactics and techniques,

---

[2]  The Qods Force is alternatively spelled Quds Force and/or referenced as IRGC-QF.

including IEDs, suicide bombings, and complex attacks and ambushes. *Attachment B at p.42*. For example, in 1991, Ayman al Zawahiri, one of the top leaders of al-Qaeda, made a secret visit to Iran to ask for help in al-Qaeda's campaign to overthrow the government of Egypt. *Id. at 38.* While in Iran, al Zawahiri met with Imad Mughniyah, the terrorist operations chief of Hezbollah. *Id.* Mughniyah was acting as an agent of the Iranian state, where he lived for many years as he coordinated high profile terrorist attacks around the globe. *Id. at p. 38.* During these meetings, Mughniyah convinced al-Qaeda of the power of suicide bombing. *Id.* This was a change in mindset for al-Qaeda because suicide was prohibited by most Islamic clerics, but Mughniyah justified it as an appropriate act of a jihad warrior. *Id.*

In 1993, Osama bin Laden and al Zawahiri met with Mughniyah and other Iranian officials, including IRGC General Mohammed Baqr Zolqadr, to work on details of a terrorism alliance. *Attachment B at p. 40.* Following the meeting, bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC both in Lebanon and Iran. *Id. at p. 41.* At these camps, Hezbollah instructors provided al Qaeda operatives, as well as members of various other Islamic terrorist organizations, with training in intelligence, security, and building explosive devices. *Id.* This terrorist training camp arrangement continued throughout the 1990s with Mughniyah coordinating the activities with Iranian government officials and the IRGC-QF. *Id.* The training focused on building stronger IEDs and shape charges. *Id. at p. 42.* Iran's Supreme Leader was aware, and approved, of the Iran-Hezbollah terrorist training program. *Id. at p.6.*

The Qods Force trained, equipped, and financed Shia militias in Iraq and throughout the Middle East both directly and through Hezbollah. *Frost*, 383 F. Supp. 3d at 39. According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the

Taliban, Hamas, Hezbollah, and Iraqi Shia militant groups. *Fritz*, 320 F. Supp. 3d at 59.  By using these groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously denying responsibility for the actions of its proxies. *Fritz*, 320 F. Supp. 3d at 59. The State Department has designated Iran as a state sponsor of terrorism, and the Treasury Department has designated the IRGC's Qods Force as an entity providing support for terrorism. *Fritz*, 320 F. Supp. 3d at 59.

   b. **Iraq**

   In 2002, al Zarqawi and senior al-Qaeda operatives met with the Qods Force in Iran. *Attachment B at p. 46*.  Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime. *Lee*, 2021 WL 325958, at *4.

   In March 2003, the Qods Force freed many of the Sunni jihadists that Iran had been holding captive, unleashing them against the U.S.  *Attachment B at p. 46*.  The Qods Force then provided al-Zarqawi and his fighters funds and weapons and facilitated al-Zarqawi's entry into the bordering Iraqi Kurdistan and onto Baghdad to attack U.S. forces.  *Id. at 47*.  Al-Zarqawi recruited former Saddam regime fighters and foreign fighters moving into Iraq from Syria— becoming al-Qaeda's man on the ground.  *Id. at 49*.

   With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Lee*, 2021 WL 325958, at *4. Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control ... over the new Iraqi government." *Lee*, 2021 WL 325958, at *4.

Iran also sought "to push the United States out of the Gulf region," including out of Iraq. *Fritz*, 320 F. Supp. 3d at 61. "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Fritz*, 320 F. Supp. 3d at 61. But, while seeking "to bloody coalition forces in Iraq," Iran was "[c]areful not to provoke a direct confrontation with U.S. and coalition forces" and thus "trained [ ] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition." *Fritz*, 320 F. Supp. 3d at 61.

To achieve that goal, Iran developed numerous Shi'a proxies with a presence in Iraq. Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr. *Lee*, 2021 WL 325958, at *4. In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM"). *Lee*, 2021 WL 325958, at *4. Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives ... to help establish JAM and provide it with logistical assistance." *Id.* al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces. *Lee*, 2021 WL 325958, at *4. For example, Al-Sadr formed Saraya al-Salam, which like previous Shia militias, received training, weapons, and money from Iran through Hezbollah and the Quds Force to advance Iran's interests in Iraq. *Frost*, 383 F. Supp. 3d at 40. Saraya al-Salam made its headquarters in the Sadr City neighborhood of Baghdad and it exerted exclusive control over that area. *Frost*, 383 F. Supp. 3d at 40.

While these Special Groups functioned independently from JAM, they were "funded, trained and armed by" IRGC "Qods Force operatives." *Fritz*, 320 F. Supp. 3d at 62. The Special

Groups "plan[ned] and execut[ed] ... bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking[,] and other attacks" against Iraqi civilians, Iraqi forces, and coalition forces. *Fritz*, 320 F. Supp. 3d at 62. The Special Groups were successful, and "the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq." *Lee*, 2021 WL 325958, at *4.

Iran then recruited new leadership for a Special Group called Asayb al-Haq or "AAH." *Lee*, 2021 WL 325958, at *4. The Supreme Leader of Iran, Ali Khomeini, "met with [Qais Khazali in Iran] and recruited him to lead [AAH]," which was to "operate without the knowledge or authorization of [Muqtada al-Sadr]." *Fritz*, 320 F. Supp. 3d at 62. AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests." *Lee*, 2021 WL 325958, at *4. Qais Khazali also met with Qods Force officers "on multiple occasions" and his brother, Laith Khazali, effectively served as his deputy. *Fritz*, 320 F. Supp. 3d at 62.

Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. *Karcher*, 396 F. Supp. 3d at 25. Since 2007, Kata'ib Hezbollah had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq," and earned the designation as a Foreign Terrorist Organization in June 2009. *Karcher*, 396 F. Supp. 3d at 25.

Iran also provided money and weapons to al Qa'ida in Iraq ("AQI"). *Attachment B at p. 51.* Iran even negotiated prisoner releases of AQI operatives. *Id. at 52.* In addition, Iran supported the Assad regime in Syria to maintain the "Shia Crescent" so it could move fighters and weapons to threaten Israeli and American interests. *Id. at p. 54.* Syrian intelligence officers

not only facilitated al-Qaeda operations in Iraq, but the Syrian border became the principal

conduit for foreign terrorists heading into Iraq to join AQI.  *Id. at 55-56.*

Abu Musab al-Zarqawi, al-Qaeda's man in Iraq and the godfather of ISIS, received

training and funds from the Qods Force in Iran before moving into Afghanistan and then heading

al-Qaeda's terrorist operations in Iraq.  *Attachment B at p. 58.*  The Qods Force provided

Zarqawi with funding, weapons, and transportation into Iraq to target U.S. troops. *Id. at 60.*

Through Hezbollah, Iran brought operatives "into Iran for training and smuggling

weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq.  *Lee*,

2021 WL 325958, at *4.  Iran also used its resources to support EFP attacks specifically: "one of

Iran's primary forms of material support to the Special Groups was financing, manufacturing and

deploying EFPs." *Lee*, 2021 WL 325958, at *4.  Iran funneled to Special Groups in Iraq EFPs

that "were professionally manufactured and specifically designed to target U.S. and Coalition

Forces' armor, such as armored patrols and supply convoys." *Lee*, 2021 WL 325958, at *4. Iran

also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC

and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of

equipment and funding to Special Groups *every month*." *Lee*, 2021 WL 325958, at *4.

Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and

other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training.

*Karcher*, 396 F. Supp. 3d at 23.  The Qods Force provided "Iraqi militants with Iranian-produced

advanced rockets, sniper rifles, automatic weapons, [and] mortars[,] [which] have killed

thousands of [c]oalition and Iraqi [f]orces," as well as "explosively formed projectiles (EFPs)

that have a higher lethality rate than other types of improvised explosive devices (IEDs)... and

are specially designed to defeat armored vehicles used by [c]oalition [f]orces." *Fritz*, 320 F.

Supp. 3d at 63.  Iran smuggled the weapons into Iraq using supply routes called "ratlines,"

primarily for use by AAH.  *Fritz*, 320 F. Supp. 3d at 63. On the Iraqi side, both Qais and Laith

Khazali were involved in smuggling arms and artillery from Iran into Iraq. *Fritz*, 320 F. Supp. 3d

at 63.  Laith Khazali, for example, "was instrumental in acquiring surface-to-air missiles

(SAMs), RPGs, bazookas and Stella missiles for [S]pecial [G]roups." *Fritz*, 320 F. Supp. 3d at

63.

    At the behest of Iran, Hezbollah created a unit "whose sole purpose was to train Iraqi

Shia militants," including AAH, to carry out attacks in Iraq directed at U.S. troops and others.

*Fritz*, 320 F. Supp. 3d at 63.  In 2005 or 2006, Hezbollah ordered Ali Musa Daqduq, a senior

Hezbollah commander, to work with the Qods Force to "provide training and equipment" to the

Special Groups, and to "organize the [S]pecial [G]roups in ways that mirrored how Hezbollah

was organized in Lebanon." *Fritz*, 320 F. Supp. 3d at 63. Daqduq, accordingly, traveled to Iraq,

"met with the commander and the deputy commander of the ... Qods Force special external

operations," and "was directed by [the] Qods Force to make trips in and out of Iraq and [to]

report on the training and operations of the Iraqi [S]pecial [G]roups." *Fritz*, 320 F. Supp. 3d at

63-64. Daqduq ultimately made four such trips to "monitor [ ] and report[ ] on the training and

arming of [S]pecial [G]roups in mortars and rockets, manufacturing and employment of [IEDs],

and kidnapping operations." *Fritz*, 320 F. Supp. 3d at 64.

    With Hezbollah's assistance, Iran provided "training at every level of the militant

organizations that received assistance, from foot soldier to leadership." *Fritz*, 320 F. Supp. 3d at

64. The leaders of Shia militias, for example, received "administrative, logistics, financial,

religious [,] and small unit tactics leadership training." *Fritz*, 320 F. Supp. 3d at 64. AAH

members were also given training in engineering, artillery, intelligence, infantry, and kidnapping.

*Fritz*, 320 F. Supp. 3d at 64. Much of the training occurred at camps in Iran. *Fritz*, 320 F. Supp. 3d at 64. The Qods Force would train "approximately 20 to 60 Iraqis at a time" in Iran and then send them back to Iraq. *Fritz*, 320 F. Supp. 3d at 64. These individuals, in turn, "passed on this training to additional militants inside Iraq," as part of "a 'train-the-trainer' program." *Fritz*, 320 F. Supp. 3d at 64. The Qods Force and Hezbollah also provided training inside Iraq. *Fritz*, 320 F. Supp. 3d at 64.

By 2007, the Treasury Department found that the Qods Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *Karcher*, 396 F. Supp. 3d at 24. In 2011, the State Department found that Iran was responsible for the increase of lethal attacks on U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed to defeat armored vehicles. *Karcher*, 396 F. Supp. 3d at 24.

c. **Afghanistan**

In addition to its activities in Iraq, Iran facilitated the movement of al-Qaeda operatives into Afghanistan and provided them with documents, identification cards, and passports. *Attachment B at p. 52*.   Iran was a transit point for moving money, arms, and fighters to Pakistan and Afghanistan.  *Id*.

According to the U.S. Department of the Treasury, the Qods Force has also supported militant groups including the Taliban. *Fritz*, 320 F. Supp. 3d at 59.  The Qods Force is Iran's primary instrument for providing lethal aid to the Taliban. *Attachment B at p. 61*.  The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. *Id*.

Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and man-portable defense systems to the Taliban. *Attachment B at p. 62*. The Taliban have conducted training in Iran too. *Id. at p. 69*. The Qods Force Ansar Corps, the IRGC command responsible for operations in Afghanistan, trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets. *Id. at 68-69.* General Hossein Musavi was the commander of The Ansar Corps, which supported operations in Afghanistan. *Id.* In addition to supplying weapons, Iran has trained the Taliban in Iran on small unit tactics to include ambushes, mortar and rocket attacks, IEF, EFPs, sniper operations, and kidnapping operations. *Id*.

## II.   ATTACKS AT ISSUE

### Attack #1 (June 24, 2004, in Baqubah, Iraq)

Plaintiffs Ralph Isabella ("Isabella"), Jeffrey N. Walton ("Walton"), Alan N. Payne ("Payne"), Chad M. Stephens, Sr. ("Stephens"), Jerry T. Moorhouse ("Moorhouse"), Thomas Rivera ("Rivera"), Ron Watkins ("Watkins"), Aaron Johnson ("Johnson"), Lynn Sorensen ("Sorensen"), James Cherry ("Cherry"), Roy Farve ("Farve"), and Antonio Fraser ("Fraser") are nationals of the United States and served in the Army National Guard. *Ex. 11; Ex. 31; Ex. 24; Ex. 29; Ex. 22; Ex. 25; Ex. 33; Ex. 12, Ex. 27; Ex. 2; Ex. 6; Ex. 7; Ex. 19.* Plaintiffs Daniel Alan Desens, Sr. and Patricia Desens are nationals of the United States and the surviving parents of Daniel Desens, Jr. ("Desens"), who was a national of the United States and served in the Army National Guard. *Ex. 5.*

On June 24, 2004, Isabella, Walton, Payne, Stephens, Moorhouse, Rivera, Watkins, Johnson, Sorensen, Cherry, Farve, Fraser, and Desens were traveling in a convoy of Bradley

Fighting Vehicles in Baqubah, Iraq. *Ex. 11; Ex. 31; Ex. 24; Ex. 29; Ex. 22; Ex. 25; Ex. 33; Ex. 12, Ex. 27; Ex. 2; Ex. 6; Ex. 7; Ex. 5.* As the convoy neared the Mufrek Traffic Circle, they were ambushed by machine gun rounds, RPGs, mortars, and a daisy chain of IEDs. *Id.* A firefight ensued, requiring additional U.S. forces. *Id.* Terrorist militia lead by Al-Zarqawi carried out this 24-hour long attack, which was coordinated with attacks in Fallujah and Al-Najaf. *Ex. 19.* Isabella sustained shrapnel wounds, a traumatic brain injury, tinnitus, and PTSD. *Ex. 11.* Walton sustained a traumatic brain injury, shrapnel wounds, facial burns, vision loss, tinnitus, and PTSD. *Ex. 31.* Payne sustained gunshot wounds to his left arm, shrapnel wounds, and PTSD. *Ex. 24.* Stephens sustained shrapnel wounds, burns, vision loss, a spinal cord injury, hearing loss, tinnitus, fibromyalgia, and PTSD. *Ex. 29.* Moorhouse sustained a traumatic brain injury, a spinal injury, tinnitus, and PTSD. *Ex. 22.* Rivera sustained burn injuries, shrapnel wounds, PTSD, vision loss, a back injury, tinnitus, and injuries to both shoulders, knees, and ankles. *Ex. 25.* Watkins sustained a detached retina in his left eye, a traumatic brain injury, and PTSD. *Ex. 33.* Johnson sustained blast injuries, traumatic brain injuries, hearing loss, an ankle injury, and PTSD.[3] *Ex. 12.* Sorensen sustained injuries to his right knee and left hand, a traumatic brain injury, hearing loss, and PTSD. *Ex. 27.* Cherry sustained hearing loss, a traumatic brain injury, a blast injury, vision loss, and PTSD. *Ex. 2.* Favre sustained a traumatic brain injury, back injury, hearing loss, and PTSD. *Ex. 6.* Fraser sustained a traumatic brain injury, vision loss, and PTSD. *Ex. 7.* Desens was struck by small arms fire and RPGs—causing a femoral artery injury which resulted in his death from exsanguination. *Ex. 5.* Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B.*

**Attack #2 (October 2006 in Bagdad, Iraq)**

---

[3] Johnson was involved in another attack in December of 2004. *See* Attack #7.

Plaintiff Bob W. Clements ("Clements") is a national of the United States and served in the Army. *Ex. 3*. In October of 2006, Clements was on patrol in Bagdad traveling in a striker vehicle when it detonated an EFP. *Id*. Clements was slammed into the deck of the vehicle. *Id*. Clements sustained a traumatic brain injury and hearing loss. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #3 (October 12, 2008, in Rustamiyah, Iraq).**

Plaintiff Jason E. Daniels ("Daniels") is a national of the United States and served in the Army. *Ex. 4a*. On October 12, 2008, Daniels was part of a breach team attempting to enter a structure to secure a target in Rustamiyah. *Id*. Upon kicking down the door, there was an explosion that knocked Daniels down and terrorists attacked with RPGs and small arms. *Id*. Daniels sustained blast injuries, shrapnel wounds, fractures in both feet, a back injury, PTSD, a traumatic brain injury, hearing loss, and knee bursitis. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #4 (November 14, 2006, in Bagdad, Iraq)**

Plaintiff Michelle Garcia is a national of the United States and the surviving spouse of Justin R. Garcia ("Garcia"), who was a national of the United States and served in the Army. *Ex. 8*. On November 14, 2006, Garcia was the gunner in an M1114 Humvee traveling in a convoy from Camp Liberty to FOB Justice when his vehicle was hit by multiple EFPs. *Id*. Garcia was knocked unconscious and pronounced dead from penetrating ballistic injuries. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attacks #5 (May 2009 in Sadr City, Iraq)**

Plaintiff Jeris T. Holt ("Holt") is a national of the United States and served in the Army. *Ex. 10*. In May of 2009, Holt was the gunner on a HUMVEE patrolling Sadr City. *Id*. An IED

struck his vehicle, knocking him unconscious. *Id*. Holt sustained blast injuries, traumatic brain injuries, PTSD, anxiety, depression, and night terrors. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #6 (March 2011 in Kadhimiva district of Bagdad, Iraq)**

In March of 2011, Holt's unit responded to an explosion at a car dealership in Bagdad. *Ex. 10*. While securing the area, additional IEDs were detonated, and one blast knocked Holt down. *Id*. Holt sustained blast injuries, traumatic brain injuries, PTSD, anxiety, depression, and night terrors. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #7 (December of 2004 in Iraq)**

After the June 24, 2004 attack, Johnson was involved in another attack in December of 2004 near FOB Caldwell. *Ex. 12*. Johnson was driving a Humvee in a convoy, noticed something in the road, turned his vehicle, and an IED exploded. *Id*. Johnson sustained blast injuries, traumatic brain injuries, hearing loss, an ankle injury, and PTSD. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #8 (June 18, 2004 north of Samarra, Iraq)**

Plaintiff Brent Jurgersen ("Brent Jurgersen") is a national of the United States and served in the Army. *Ex. 13*. On June 18, 2004, Brent Jurgersen was part of an engineering mission north of Samarra to reduce berms that insurgents had used to bury IEDs. *Id*. During that mission, Brent Jurgersen's unit came under attack. *Id*. A bullet, along with fragments of his M-16, struck Brent Jurgersen in the upper lip, broke seven of his teeth, chipped other teeth, shredded his tongue, and lodged in the back of his throat. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attacks #9 (January 26, 2005 in Ad Duluiyah, Iraq)**

After recovering from the June 18, 2004 attack, Brent Jurgersen returned to Iraq.  *Ex. 13*.

On January 26, 2005, Brent Jurgersen was part of a recon patrol in Ad Duluiyah inspecting

polling sites before the Iraqi national election.  *Id*.  After inspecting the second polling site, Brent

Jurgersen's HMMWV was hit by two armor piercing RPGs.  *Id*.  Brent Jurgersen sustained facial

trauma, dental trauma, an open compressed skull fracture with a brain hematoma, a traumatic

brain injury, an above the knee amputation of his left leg, a right knee injury, an open fracture of

his right hand and ring finger, detrusor instability, lumbar spine injury, left elbow fracture, right

shoulder injury, numerous shrapnel wounds and burns, PTSD, sleep apnea, tinnitus, hearing loss,

and vision problems.  *Id*.  Defendant's material support or resources was a substantial factor

leading to the attack.  *Attachment B*.

**Attack #10 (July 1, 2004 in Baqubah, Iraq).**  Plaintiff Jeffrey A. Leake ("Leake") is a

national of the United States and served in the Army National Guard.  *Ex. 15*.  On July 1, 2004,

Leake was traveling in an M113 Armored Personnel Carrier conducting a routine clearing

mission in Baqubah.  *Id.*  An IED hit his APC.  *Id.*  The detonation resulted in a traumatic brain

injury, vision loss, migraines, and PTSD.  *Id.*  Defendant's material support or resources was a

substantial factor leading to the attack.  *Attachment B*.

**Attack #11 (February 7, 2007, in Mosul, Iraq)**

Plaintiff Joe Markell ("Markell"), Kyle Lewis ("Lewis"), Bradley Spry ("Spry"), Jarrett

H. Taylor ("Taylor") are nationals of the United States and served in the Army.  *Ex. 17a; Ex. 16;*

*Ex. 28; Ex. 30*.  On February 7, 2007, Markell, Lewis, Spry, and Taylor were traveling in a

convoy of Humvees through Mosul.  *Id*.  An EFP struck the rear vehicle, causing the other

vehicles to stop.  *Id*.  Then a secondary IED hit the lead vehicle and the convoy was hit by small

arms fire. *Id*. Markell sustained traumatic brain injuries, tinnitus, and PTSD. *Ex. 17a*. Lewis sustained traumatic brain injuries, chronic hip pain, tinnitus, and PTSD. *Ex. 16*. Spry sustained traumatic brain injuries, back and neck injuries, tinnitus, and PTSD. *Ex. 28*. Taylor sustained traumatic brain injuries, right upper extremity radiculopathy, neck pain, right knee pain, tinnitus, and PTSD. *Ex. 30*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

### Attack #12 (May of 2007 in northern Iraq)

A few months later, Markell, Lewis, Spry, and Taylor were traveling in a Humvee near Tal Afar when their vehicle was hit by a large IED at very close range. *Ex. 17a; Ex. 16; Ex. 28; Ex. 30*. Markell sustained traumatic brain injuries, tinnitus, and PTSD. *Ex. 17a*. Lewis sustained traumatic brain injuries, chronic hip pain, tinnitus, and PTSD. *Ex. 16*. Spry sustained traumatic brain injuries, back and neck injuries, tinnitus, and PTSD. *Ex. 28*. Taylor sustained traumatic brain injuries, right upper extremity radiculopathy, neck pain, right knee pain, tinnitus, and PTSD. *Ex. 30*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

### Attacks #13 (November 14, 2006 in Baqubah, Iraq)

Plaintiff Daniel T. Mayer ("Mayer") is a national of the United States and served in the Army. *Ex. 18*. Around November 14, 2006, Mayer was driving an RG-31 MRAP vehicle on patrol in Baqubah when it was hit by two terrorist RPGs. *Id*. Mayer sustained a traumatic brain injury. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

### Attack #14 (September 10, 2004, in the Diyala Province, Iraq)

Don McCallum ("McCallum") was part of main supply route recon just north of

Baqubah.  *Ex. 19*.  Upon discovering some suspicious disturbed dirt, McCallum's Bradley

Fighting Vehicle stopped to change direction when it denoted an anti-tank mine.  *Id*.

Immediately after the explosion, the insurgents attacked with small arms fire.  *Id*.  McCallum

sustained traumatic brain injuries, injuries to both legs, a back injury, PTSD, and an assortment

of related health problems resulting from his injuries.  *Id*.  Defendant's material support or

resources was a substantial factor leading to the attack.  *Attachment B*.

### Attacks #15 (November 30, 2006, in Mosul, Iraq)

Plaintiff Dillon J. McNeeley ("McNeeley") is a national of the United States and served

in the Army.  *Ex. 20*.  On November 30, 2006, McNeeley was driving an Army truck conducting

security for an engineering unit on a road called "Santa Fe."  *Id*.  It was dark when the truck was

hit by a roadside bomb.  *Id*.  After the explosion, the truck was ambushed by small arms fire.  *Id*.

With a fellow serviceman badly injured, McNeeley was covered in blood and drove the truck,

with three blown out tires, out of the kill zone back to the hospital.  *Id*.  McNeeley sustained

hearing loss and PSTD.  *Id*.  Defendant's material support or resources was a substantial factor

leading to the attack.  *Attachment B.*

### Attack #16 (July of 2007 in Mosul, Iraq)

Approximately eight months later, McNeeley was part of a truck convoy headed toward

Bodoush prison in Mosul.  *Ex. 20*.  When McNeeley's truck turned left on "Santa Fe," the truck

was hit by a roadside bomb.  *Id*.  Immediately after the explosion, the convoy was ambushed

with RPGs and small arms fire.  *Id*.  McNeeley sustained hearing loss and PSTD.  *Id*.

Defendant's material support or resources was a substantial factor leading to the attack.

*Attachment B*.

**Attacks #17 (Explosive Ordinance Disposal Duties in November 2006 – January 2007 in Mosul, Iraq)**

Plaintiff Francisco E. Miguel ("Miguel") is a national of the United States and served in the Army. *Ex. 21*. Between November of 2006 and January of 2007, Miguel provided escort services for Explosive Ordnance Disposal personnel, who located, defused, and/or detonated EFPs, IEDs, and other road-side bombs planted by terrorists around Mosul. *Id*. During that time, Miguel was exposed to blasts from that weaponry. *Id*. Miguel sustained hearing loss, tinnitus, and PTSD. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B.*

**Attack #18 (February 15, 2011, near Kalsu, Iraq)**

Plaintiff Zachary Carl Roth ("Roth") is a national of the United States and served in the Army. *Ex. 26*. On February 15, 2011, he was driving an M1151 Enhanced Armament Carrier on a main supply route from Al-Hillah to Bagdad for a mission to gather evidence from a previous EFP attack. *Id*. After passing through an Iraqi police checkpoint, an EFP was remotely detonated near his vehicle. *Id*. The EFP was covered by a mound of dirt in the middle of the road. *Id*. The detonation caused the vehicle to roll and flip violently. *Id*. Roth sustained a traumatic brain injury, a back injury, an ankle injury, and PTSD from the attack. *Id*. Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #19 (June 2003 near Kirkuk Province, Iraq)**

Plaintiff Jonas Ware ("Ware") is a national of the United States and served in the Army. *Ex. 32*. In June of 2003, Ware was driving a HUMVEE as part of a return supply convoy near Al Hawija when an IED detonated in front of his vehicle. *Id*.

**Attack #20 (August 2003 near Al Hawija, Iraq)**

About a month later, Ware was traveling along the same route when another IED struck his HUMVEE.  *Id*.  Ware sustained traumatic brain injuries, hearing loss, tinnitus, and PTSD. *Id*.  Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B*.

**Attack #21 (June 6, 2004, in the Abu-Ghraib District, Iraq)**

Plaintiff Lloyd Williams ("Williams") is a national of the United States and served in the Marine Corps.  *Ex. 34.*  On June 6, 2004, Williams was traveling in a convoy of Humvees returning to his base from Abu-Ghraib. *Id.*  An IED hit Williams' Humvee, causing it to crash. *Id.*  Williams was hit by shrapnel and lost consciousness from the blast.  *Id.*  The detonation resulted in a traumatic brain injury, shrapnel injury to his left hand, PTSD, tinnitus, and bipolar disorder.  *Id.*  Defendant's material support or resources was a substantial factor leading to the attack.  *Attachment B.*

**Attack #22 (February 8, 2007, in Hassa, Iraq)**

Plaintiff James R. Williamson ("Williamson") is a national of the United States and served in the Marine Corps.  *Ex. 35.*  On February 8, 2007, Williamson participated in a sweep of Hassa, part of a key route for the flow of enemy foreign fighters, weapons, and munitions into Iraq.  *Id*.  While moving his LAV-25 into position, insurgents launched an anti-personnel RPG which hit William's vehicle, helmet, protective glasses, left check, and wrist.  *Id.*  The attack resulted in temporomandibular joint disorder and PTSD.  *Id.*  Defendant's material support or resources was a substantial factor leading to the attack.  *Attachment B.*

**Attack #23 (March 9, 2011, in Kajaki District, Afghanistan)**

Plaintiff Robert S. Bruce ("Bruce") is a national of the United States and served in the

Marine Corps. *Ex. 1*. Afghan village elders had alerted Afghan National Police that Taliban forces had placed IEDs on Devin Hill, a small hill in the middle of a village referred to as "SK." *Id*. On March 9, 2011, Bruce was a squad leader assigned to sweep Devin Hill for IEDs. *Id*. IEDs were made from random materials and ordnance, but most had a pressure plate trigger consisting of wood and fine copper wire. *Id*. After a member of his squad triggered an IED, Bruce moved toward the injured Marine to render aid. *Id*. After a few steps, another IED detonated under Bruce. *Id.* The detonation resulted in the amputation of both of Bruce's legs below the knee, fragmentation wounds to his upper legs and buttocks, a traumatic brain injury, back pain, tinnitus, hearing loss, and PTSD. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B.*

### Attack #24 (July 2013 near Puli Alam, Afghanistan)

In July of 2013, Holt's unit was returning to base on foot near Puli Alam, Afghanistan when terrorists attacked with rockets. *Ex. 10*. The blasts knocked Holt down but killed some fellow service members. *Id.* Holt sustained blast injuries, traumatic brain injuries, PTSD, anxiety, depression, and night terrors. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Attachment B.*

**Attacks #25 (2007-2008 in Afghanistan).** Plaintiff Chase Jurgersen ("Chase Jurgersen") is a national of the United States and served in the Army. *Ex. 14*. From August of 2007 until August of 2008, Chase Jurgersen was a member of the 173 Airborne, 1-91 Cav Regiment serving in the Kunar and Nuristan provinces of Afghanistan. *Id*. Chase Jurgersen was airlifted into areas to secure terrains, trained Afghan locals, and provided security for road repairs. *Id*. Throughout this time, Chase Jurgersen repeatedly came under attack by terrorists armed with RPGs, rockets, mortars, and small arms. *Id*. He witnessed an unbelievable amount of carnage and death to his

fellow servicemen, Afghan locals, and contractors. *Id*. Chase Jurgersen sustained a traumatic

brain injury, PTSD, hearing loss, tinnitus, and back injuries. *Id*. Defendant's material support or

resources was a substantial factor leading to the attacks. *Attachment B.*

**Attack #26 (November of 2012 in Kandahar, Afghanistan)**

A few years later, Chase Jurgersen returned to Afghanistan with the 3rd Brigade, 2nd

Infantry, 8-1 Cav Regiment. *Ex. 14*. In November of 2012, Chase Jurgersen was manning the

gun turret in a striker vehicle while clearing a dry riverbed. *Id*. The truck in front was hit by an

IED. *Id*. Chase Jurgersen sustained a traumatic brain injury, PTSD, hearing loss, tinnitus, and

back injuries. *Id*. Defendant's material support or resources was a substantial factor leading to

the attack. *Attachment B.*

## ARGUMENT

This Court may enter default judgment when (1) it has subject-matter jurisdiction over

the claim, (2) personal jurisdiction is properly exercised over Iran, and (3) the plaintiffs have

presented satisfactory evidence to establish their claims against Iran, and (4) the plaintiffs prove

the monetary damages they seek. *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK),

2022 WL 971328, at *4 (D.D.C. Mar. 31, 2022)

Here, Plaintiffs submit evidence regarding the first three steps for the requisite default

liability findings before proof of their damages.

## I.   THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE CLAIMS AGAINST IRAN

While foreign states are generally immunized from jurisdiction, 28 U.S.C. § 1604, this

Court has original jurisdiction in "nonjury civil action" seeking "relief in personam with respect

to which the foreign state is not entitled to immunity …." 28 U.S.C. § 1330(a). According to the

Foreign Sovereign Immunities Act:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Here, Plaintiffs seek damages "for personal injury ... that was caused by" acts for which Defendant provided "material support or resources."  28 U.S.C. § 1605A(a)(1).  In the operative complaint, Plaintiffs allege that Defendant was designated as a state sponsor of terrorism, [Doc. #27 ¶2], who provided material support or resources to its agents, including Hezbollah, the Islamic Revolutionary Guard Corps, the Taliban, al Qaeda, and others.  [Doc. #27 ¶¶ 3, 9-66].  Armed with that material support and those resources, Defendant's agents then committed terrorist acts that caused personal injuries to Plaintiffs.  [Doc. #27 ¶¶ 67-384].  As a result, Plaintiffs seek damages for "their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses ...."  [Doc. #27 ¶388].  Because Plaintiffs' claims for damages arise from personal injuries caused by acts for which Defendant provided material support, Defendant doesn't enjoy foreign sovereign immunity.

Plaintiffs' claims are predicated on Defendant's "material support or resources" for an extrajudicial killing.  An "extrajudicial killing" is a killing, that is deliberated, and is not authorized by a previous judgment pronounced by a regularly constituted court or lawfully carried out under authority of a foreign nation.  28 U.S.C. § 1605A(h)(7); *Owens*, 864 F.3d at 770.  While some of the attacks at issue resulted in death, an extrajudicial killing includes "'deliberated' attempts to kill ...." *Karcher, 396 F. Supp. 3d at 58* (citing *Schertzman Cohen v. Islamic Republic of Iran,* No. 17-cv-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11,

2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).  As a result, liability attaches "where a designated state supplies material resources in an attempt to commit an extrajudicial killing." *Lee*, 2021 WL 325958, at *12.

Based upon the testimony submitted, the attacks at issue all involved extrajudicial killings.  The evidence confirms that each attack was, at a minimum, an attempt to kill. Furthermore, a "'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Lee*, 2021 WL 325958, at *12.  The evidence confirms that each attack involved deliberate and strategic attempts to kill.  There is simply no evidence to suggest that any of these attacks were "on a sudden impulse;" rather, they were all part of a terror campaign. Finally, there is no evidence that the attempted killings were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation.

The FSIA next requires that an official or agent of Iran provided "material support or resources" to the people who carried out the attacks at issue.  28 U.S.C. § 1605A(a)(1).  The FSIA adopted the following definition of "material support or resources":

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation, except medicine or religious materials[.]

28 U.S.C. § 1605A(h)(3) (adopting the definition of 18 U.S.C. § 2339A(b)(1)).  Here, the evidence contains numerous examples of Iran funneling material support through the IRGC and Qods Force to terrorist proxies in Iraq and Afghanistan.  The Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55. This material support manifested

as millions of dollars of funding, training, and advanced weaponry. *Lee*, 2021 WL 325958, at *13.

Plaintiffs must also show that Defendant's material support or resources "caused" their personal injuries. 28 U.S.C. § 1605A(c). That requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794. But the provision of material support doesn't need to "go directly for the specific act." *Id.* at 799. Because material support "is difficult to trace" and "is fungible," courts don't require either specific intent or direct traceability to establish the liability of material supporters of terrorism. *Id. See also Boim v. Holy Land Foundation for Relief and Devel.*, 549 F.3d 685, 698 (7th Cir. 2008) (approving liability even when donations were made for non-terrorism purposes). Instead, there need only be evidence that Defendant's actions were a **"substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."** *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013) (emphasis added)).

Pregent confirms that Defendant's material support or resources resulted in the attacks at issue. *Attachment B.* Pregent undertook a detailed analysis of each attack, attributed each attack to a particular terrorist group(s), and submitted proof—in addition to the judicially-noticed factual findings—of how Defendant, through material support or resources, supported those particular terrorist group(s). *Id.* As a result, Defendant's material support or resources to support terrorist activities caused Plaintiffs' injuries.

When a plaintiff seeks monetary damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

material support or resources for such an act," this Court shall hear the claim if: (1) "the foreign country was designated a state sponsor of terrorism" at the time of the act, due to the act, or within 6 months before the claim was filed, 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) the claimant or the victim was a national, member of the armed forces, or an employee or contractor of the United States at that time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III); and (3) the claimant afforded the foreign state a reasonable opportunity to arbitrate when "the act occurred in the foreign state …." 28 U.S.C. § 1605A(a)(2)(A)(iii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13-14 (D.C. Cir. 2015).

### a. Defendant Was Designated a State Sponsor of Terrorism at the Time of the Terrorist Acts.

Since January 19, 1984, the United States has designated Defendant as a state sponsor of terrorism. [Doc. #27 ¶2]. *See also Blais*, 459 F. Supp. 2d at 47. In this case, the terrorist acts occurred from 2003 to 2013. [Doc. #27 ¶¶67-384]; *Exs. 1-36*. As a result, Defendant was a state sponsor of terrorism at the time of the acts. 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

### b. Plaintiffs Were Both Nationals and Members of the Armed Forces at the Time of the Terrorist Acts.

At the time of the terrorist attacks, Plaintiffs were both nationals and members of the armed forces of the United States. *Exs. 1-35*. In addition to their sworn testimony, Plaintiffs have submitted their DD Form 214 to confirm their service in the armed forces at the time of the terrorist attacks. *Id.* As a result, Plaintiffs were both nationals and members of the armed forces of the United States at the time of the terrorist attacks. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III).

### c. None of the Terrorist Acts Occurred Within Defendant's Boundaries.

The terrorist attacks at issue occurred in Iraq and Afghanistan. [Doc. #27 ¶¶ 67-384]; *Exs. 1-35*. None of the terrorist attacks occurred in Iran. *Id.* As a result, the requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing this

action doesn't apply. 28 U.S.C. § 1605A(a)(2)(A)(iii).  As a result, this Court may properly exercise subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a).

## II.   THIS COURT HAS PERSONAL JURISDICTION OVER IRAN

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction ... where service has been made under section 1608 …."  28 U.S.C. § 1330(b).   While section 1608 details four possible methods of serving a foreign state, Defendant has "neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017); [Doc. #s 16-17].  Consequently, there were two remaining options to serve Defendant here.

First, a party shall serve a foreign state by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned …."  28 U.S.C. § 1608(a)(3).  If service cannot be made within 30 days, then a party shall serve a foreign state by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  28 U.S.C. § 1608(a)(4).

Here, Plaintiffs sent the necessary papers to Defendant via "mail requiring a signed receipt."  [Doc. #s 16-17].  That complied with 28 U.S.C. § 1608(a)(3).  Next, Plaintiffs transmitted the necessary papers to Defendant via diplomatic channels.  [Doc. #37].  That

complied with 28 U.S.C. § 1608(a)(4).  Because service on Defendant was proper, personal

jurisdiction exists here.

### III.     IRAN IS LIABLE UNDER FSIA  § 1605A(c) FOR ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant is responsible for the consequences of providing support and resources to the

terrorists who conducted the attacks.  28 U.S.C. § 1605A(a)(1).  In addition, Defendant "shall be

vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C. § 1605A(c).

Here, Plaintiffs submitted evidence that Defendant primarily acted through its Qods Force, its

Ministry of Intelligence and Security ("MOIS"), and Lebanese Hezbollah to provide support and

resources to the particular terrorists who injured Plaintiffs.  *Attachments B, D.*  "There is almost

total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception

to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of

sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of

law." *Salzman*, 2019 WL 4673761, at *15 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp.

3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic

of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d

at 86–87; *Lee*, 2021 WL 325958, at *15.  As a result, there is more than satisfactory evidence to

establish Defendant's liability.

### a. Applicable Standard

"[T]he question whether a statute withdraws sovereign immunity is 'analytically distinct'

from whether a plaintiff has a cause of action" for which the defendant may be found liable.

*Owens*, 864 F.3d at 807 (quoting *FDIC v. Meyer,* 510 U.S. 471, 484 (1994)).  Each of the

Plaintiffs in this case sues Iran under the federal private right of action Congress provided to

eligible individuals under FSIA § 1605A(c).  That section provides that a state sponsor of

terrorism is liable, *inter alia*, "to a national of the United States," and all the Plaintiffs have proved they were U.S. citizens at the time of the attacks.

In addition, FSIA § 1605A(c) requires Plaintiffs "to prove a theory of liability" that justifies holding Iran liable for their injuries. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012).  Courts define the theory of "personal injury" needed to prevail on a § 1605A(c) claim by looking to "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to define the elements and scope of these theories of recovery."  *Oveissi, supra at 54;* see also *Fraenkel v. Islamic Repub. of Iran, et al.,* 892 F.3d 348, 353 (D.C. Cir. 2018).

As discussed in Plaintiffs' Memorandum in Support of Their Motion for Default Judgment [Doc. #44], Plaintiffs have presented overwhelming evidence that Iran provided material support for the attacks that caused Plaintiffs' harm.  These terrorist acts include conduct that satisfies all the elements of the Plaintiffs' tort claims for assault, battery, and intentional infliction of emotional distress, according to the elements articulated by the Restatement (Second) of Torts. Am. Compl. ¶¶ 34-39.  Family Member Plaintiffs bring claims for intentional infliction of emotional distress seeking solatium damages.  All of the Plaintiffs' evidentiary declarations, attached as *Exhibits 1-8, 10-22, 24-35, 4a, and 17a* to Plaintiffs' Memorandum in Support of Motion for Default Judgment, make out the elements of the applicable tort theories that correspond to their claims, based on the specific facts of their unique experiences. [Doc. #44].

### b. Plaintiffs Have Established Valid Theories of Recovery.

#### 1. The Solider Plaintiffs Have Established Their Assault Claims.

"According to the Restatement (Second) of Torts, a defendant has committed an assault if 'he acts intending to cause a harmful or offensive contact with [a] person, or an imminent apprehension of such a contact' and the person is 'thereby put in such imminent apprehension." *Sutherland*, 151 F. Supp. 2d at 48 (quoting Restatement (Second) of Torts § 21(1) ("Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'")); Restatement (Second) of Torts § 15.  On the other hand, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." *See id.* § 19.

Here, Iran is liable for assaulting the Solider Plaintiffs who, as established by their declarations, were physically harmed and terrified by the terrorists' actions.  The terrorists clearly intended to inflict that harm, and fear of harm, by using EFPs, Non-EFPs, as well as grenades and other explosive devices to target the soldiers; aiming weapons at the soldiers; and killing one soldier Plaintiff.  *See generally*, *Attachment B*, Plaintiff Declarations; *Desens Ex. 5.*

Accordingly, Iran, as a provider of material support for these heinous acts, is liable for the pain and suffering caused by the assaults carried out by its terrorist agents in service of Iran's official foreign policy.  *See Valore*, 700 F. Supp. 2d at 76 ("It is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: ***acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm.***  Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, the Court concludes that defendants are liable for assault.") (emphasis added); *Sutherland*, 151 F. Supp. 2d at 48-9.

**2. The Soldier Plaintiffs Have Established Their Battery Claims.**

Liability for battery arises when a defendant "acted 'intending to cause a harmful or offensive contact with … or an imminent apprehension of such a contact' by, those attacked and [ ] 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (alteration in original) (quoting Restatement (Second) of Torts § 13); *see also* Restatement (Second) of Torts § 18 (covering offensive contact that actually occurs). Again, "[h]armful contact is that which results in any physical impairment of the condition of another's body, or physical pain or illness." *Id.* (internal quotation marks omitted). Moreover, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19.

Here, Soldier Plaintiffs were shot, thrown, and injured. *See generally Attachment B,* Plaintiff Declarations; *Allan* at *5-7.  The terrorists additionally destroyed soldiers' vehicles, barracks, and/or hiding places with both explosives and various weaponry. *Id.*; *see also Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342 (D.D.C. 2016) ("'Harmful contact' … can be caused by contacting either another's person directly or an instrumentality that acts as an extension of the individual's person, ***such as a car or airplane in which the individual is traveling*** ....") (emphasis added). Thus, Iran, as the provider of material support for these intentional acts of physical harm, is liable for the pain and suffering caused by these acts of battery. *See Sutherland*, 151 F. Supp. 2d at 48; *Valore*, 700 F. Supp. 2d at 77.

**3. The Plaintiffs Have Established Their Emotional Distress Claims.**

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*,

659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)). "***All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience***: The more extreme and outrageous, the greater the resulting distress." *Stethem* at 89 (emphasis added); *see also* Restatement (Second) of Torts § 46, Comment (j) ("***Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that distress has existed.***") (emphasis added).

Here, the Solider Plaintiffs' declarations (*Exhibits 1-8, 10-22, 24-35, 4a, and 17a*) describe their various feelings of tremendous terror, fear, helplessness, dread, and severe anxiety wreaked on them as a result of being threatened and attacked.  As described by each Solider Plaintiff within *Exhibits 1-8, 10-22, 24-35, 4a, and 17a*, each experienced severe distress while being deployed, attacked, and after returning home.  Thus, Iran, as the provider of material support to the terrorists, is liable for the pain and suffering caused by their acts of intentional infliction of emotional distress. *See Stethem* at 87; *see also Sutherland*, 151 F. Supp. 2d at 49-51 (Iran was liable for intentional infliction of emotional distress suffered by plaintiff because it funded and controlled Hezbollah.).

The Family Member Plaintiffs also have established their emotional distress claims. "Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005)*; see also Stethem* at 89; *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) (the "'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'être*").

Accordingly, even where a family member was not physically present during a terrorist attack, they may recover for claims of intentional infliction of emotional distress in FSIA terrorism cases. *Heiser*, 659 F. Supp. 2d at 27; *Valore*, 700 F. Supp. 2d at 80 ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result."); *Republic of Sudan v. Owens*, 194 A.3d 38, 45 (D.C. 2018) ("We see little need to enforce the presence requirement in IIED cases where the jurisdictional elements of § 1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family.").  Only immediate family members including one's spouse, parents, siblings, and children (or in rare cases other individuals residing in the victim's household who in other important respects were like a spouse, parent, sibling, or child to the victim) may recover.  *Heiser*, 659 F. Supp. 2d at 28-29.  Here, the Family Member Plaintiffs' declarations establish that they all qualify as immediate family members.

Those declarations also establish that all the Family Member Plaintiffs suffered from severe emotional distress because of the terrorists' intentional and reckless acts of terrorism. All Family Member Plaintiffs were forced to live nationally televised terrorists' activity in Iraq and Afghanistan, all the while fearing for their loved ones' lives.  Some Family Member Plaintiffs had to endure this horror during the entire time that their loved ones were in unknown locations in Iraq and Afghanistan, while the injured soldiers received medical treatment abroad far from their homes. *See generally Exhibits 1-8, 10-22, 24-35, 4a, and 17a,* Plaintiff Declarations. These events resulted in severe emotional distress for all the Family Member Plaintiffs that unquestionably rises to an actionable level under the Restatement. *See Stethem* at 92; *Sutherland*, 151 F. Supp. 2d at 43, 50-52 (acknowledging family members' anguished feelings, both during

and after their loved one's release, and holding Iran liable for damages suffered for intentional infliction of emotional distress).

## CONCLUSION

WHEREFORE, Plaintiffs request that this Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and directing Plaintiffs how to proceed with regard to the presentation of evidence as to monetary damages.

DATED: May 16, 2022.                          Respectfully submitted,


By: /s/ Bradley M. Lakin
    Bradley M. Lakin DC Bar No. AZ0019
    bradl@championsfortheinjuredcom
    SL CHAPMAN, LLC
    10805 Sunset Office Drive, Suite 300
    St. Louis, MO 63127
    314.588.9300
    314.588.9302 fax