UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ZACHARY CARL ROTH, SR. et al,

    Plaintiffs,

v().

ISLAMIC REPUBLIC OF IRAN,

    Defendant.

Case No. 1:19-cv-02179

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OPINION AND ORDER

    This case involves claims under the Foreign Sovereign Immunities Act ("FSIA") against Iran for materially supporting terrorist activities leading to multiple different attacks in Iraq and Afghanistan that resulted in the deaths of two serviceman and permanent injuries to thirty-two others. Iran has failed to respond to the complaint, the clerk has entered a default, and Plaintiffs have moved for default judgment.

    A request for default judgment under the FSIA is governed by the statutory requirement that "[n]o judgment by default shall be entered ... against a foreign state ... unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (internal quotation marks omitted). "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

## FINDINGS OF FACT

    This case, unfortunately, is not the first involving Iran's activities in supporting terrorism. Indeed, several courts have made multiple findings of fact regarding Iran's material support or resources provided to foment terrorist activities in Iraq and the Middle East. *See, e.g., Pennington v. Islamic Republic of Iran*, No. CV 19-796 (JEB), 2022 WL 168261 (D.D.C. Jan. 19, 2022); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019); *Karcher*, CV 16-232 (CKK), 2021 WL 133507, at *1 (D.D.C. Jan. 14, 2021); *Lee v. Islamic Republic of Iran*, 19-CV-00830 (APM), 2021 WL 325958 (D.D.C. Feb. 1, 2021); *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB; *Selig v. Islamic Republic of Iran*, 2021 WL 5446870, ---- F.Supp.3d ---- (D.D.C. November 22, 2021). Pursuant

to Federal Rule of Evidence 201(b), the court takes judicial notice of the relevant findings of fact in those prior decisions.

While relying upon the findings in the prior decisions, the court has also independently reviewed the evidence submitted by Plaintiffs, including exhibits along with the declarations of Plaintiffs and expert Michael P. Pregent ("Pregent"), to reach its findings of fact here. The court finds that Pregent meets the requirements of Rule 702 for an expert witness. In fact, Pregent has provided expert testimony in the *Frost*, *Karcher*, *W.A.*, *Pennington* and *Lee* cases—the very cases from which the court has taken judicial notice of numerous findings of fact.

**Iran's Role in the Region**. In 1979, the Supreme Leader of Iran established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran." *Lee*, 2021 WL 325958, at *3. Over the years, Iran built up combat forces composed of religious extremists and created "a fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods Force" ("Qods Force").[1] *Lee*, 2021 WL 325958, at *3. To preserve the ideals of the Islamic Republic, the Qods Force supports militias beyond its borders. *Frost*, 383 F. Supp. 3d at 39. Iran, of course, borders Iraq, Afghanistan, and Pakistan. Among other responsibilities, the Qods Force is charged with "cultivating and supporting pro-Iran proxies" in foreign countries and coordinating with these militant groups to conduct terrorist attacks. *Fritz*, 320 F. Supp. 3d at 59. The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government." *Lee*, 2021 WL 325958, at *3. The Qods Force is responsible to and directed by the Supreme Leader of Iran. *Frost*, 383 F. Supp. 3d at 39.

In the early 1980s, a loose network of Shia militas seeking to transform Lebanon into an Islamic republic formed Hezbollah. *Fritz*, 320 F. Supp. 3d at 60. Iran and the IRGC were "provid[ing] critical assistance to newly emerging Hezbollah, which swore an oath of fealty to Iran." *Lee*, 2021 WL 325958, at *4. In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah." *Lee*, 2021 WL 325958, at *4. Hezbollah acts mainly at the direction of Iran. *Frost*, 383 F. Supp. 3d at 39. "Iran provides Hezbollah with as much as $700 million–$1 billion per year" in the form of cash, training, intelligence, and weapons. *Fritz*, 320 F. Supp. 3d at 60. Hezbollah envisions itself as "the sharp end of the spear [,] going where Iran tells it to go in defense of ... Shia [Muslims] around the world." *Fritz*, 320 F. Supp. 3d at 60. Indeed, Hezbollah has committed numerous terrorist attacks on Americans at the behest of Iran. *Fritz*, 320 F. Supp. 3d at 60.

By the early 1990s, Hezbollah started to train al-Qaeda on its tactics and techniques, including IEDs, suicide bombings, and complex attacks and ambushes. *Attachment B at ¶¶36-50*. For example, in 1991, Ayman al Zawahiri, one of the top leaders of al-Qaeda, made a secret visit to Iran to ask for help in al-Qaeda's campaign to overthrow the government of Egypt. *Id*. While in Iran, al Zawahiri met with Imad Mughniyah, the terrorist operations chief of Hezbollah. *Id*. Mughniyah was acting as an agent of the Iranian state, where he lived for many years as he coordinated high profile terrorist attacks around the globe. *Id. at ¶38*. During these meetings,

---

[1] The Qods Force is alternatively spelled Quds Force and sometimes referred to as IRGC-QF.

Mughniyah convinced al-Qaeda of the power of suicide bombing. *Id*. This was a change in mindset for al-Qaeda because suicide was prohibited by most Islamic clerics, but Mughniyah justified it as an appropriate act of a jihad warrior. *Id*.

In 1993, Osama bin Laden and al Zawahiri met with Mughniyah and other Iranian officials, including IRGC General Mohammed Baqr Zolqadr, in Khartoum, Sudan to work on details of a terrorism alliance. *Attachment B at ¶40*. Following the meeting, bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC both in Lebanon and Iran. *Id*. At these camps, Hezbollah instructors provided al-Qaeda operatives, as well as members of various other Islamic terrorist organizations, with training in intelligence, security, and building explosive devices. *Id*. This terrorist training camp arrangement continued throughout the 1990s with Mughniyah coordinating the activities with Iranian government officials and the IRGC-QF. *Id*. The training focused on building stronger IEDs and shape charges. *Id. at ¶45*. Iran's Supreme Leader was aware, and approved, of the Iran-Hezbollah terrorist training program. *Id*.

The Qods Force trained, equipped, and financed Shia militias in Iraq and throughout the Middle East both directly and through Hezbollah. *Frost*, 383 F. Supp. 3d at 39. According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, Hezbollah, and Iraqi Shia militant groups. *Fritz*, 320 F. Supp. 3d at 59. By using these groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously denying responsibility for the actions of its proxies. *Fritz*, 320 F. Supp. 3d at 59. The State Department has designated Iran as a state sponsor of terrorism, and the Treasury Department has designated the Qods Force as an entity providing support for terrorism. *Fritz*, 320 F. Supp. 3d at 59.

**Iraq**. Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime. *Lee*, 2021 WL 325958, at *4. For example, in 2002, Abu Musab al-Zarqawi and senior al-Qaeda operatives met with the Qods Force in Iran. *Attachment B at ¶46*.

In March 2003, the Qods Force freed many of the Sunni jihadists that Iran had been holding captive, unleashing them against the U.S. *Id*. The Qods Force then provided al-Zarqawi and his fighters funds and weapons and facilitated al-Zarqawi's entry into the bordering Iraqi Kurdistan and then onto Baghdad to attack U.S. forces. *Attachment B at ¶47*. Al-Zarqawi recruited former Saddam regime fighters and foreign fighters moving into Iraq from Syria—becoming al-Qaeda's man on the ground. *Attachment B at ¶49*.

With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Lee*, 2021 WL 325958, at *4. Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control ... over the new Iraqi government." *Lee*, 2021 WL 325958, at *4.

Iran also sought "to push the United States out of the Gulf region," including out of Iraq. *Fritz*, 320 F. Supp. 3d at 61. "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Fritz*, 320 F. Supp. 3d at 61. But, while seeking "to bloody coalition forces in Iraq," Iran was "[c]areful not to provoke a direct confrontation with U.S. and coalition forces" and thus "trained[ ] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition." *Fritz*, 320 F. Supp. 3d at 61.

To achieve that goal, Iran developed numerous Shi'a proxies with a presence in Iraq. Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr. *Lee*, 2021 WL 325958, at *4. In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM"). *Lee*, 2021 WL 325958, at *4. Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives ... to help establish JAM and provide it with logistical assistance." *Id.* Al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces. *Lee*, 2021 WL 325958, at *4. For example, Al-Sadr formed Saraya al-Salam, which like previous Shia militias, received training, weapons, and money from Iran through Hezbollah and the Quds Force to advance Iran's interests in Iraq. *Frost*, 383 F. Supp. 3d at 40. Saraya al-Salam made its headquarters in the Sadr City neighborhood of Baghdad and it exerted exclusive control over that area. *Frost*, 383 F. Supp. 3d at 40.

While these Special Groups functioned independently from JAM, they were "funded, trained and armed by" the "Qods Force operatives." *Fritz*, 320 F. Supp. 3d at 62. The Special Groups "plan[ned] and execut[ed] ... bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking[,] and other attacks" against Iraqi civilians, Iraqi forces, and coalition forces. *Fritz*, 320 F. Supp. 3d at 62. The Special Groups were successful, and "the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq." *Lee*, 2021 WL 325958, at *4.

Iran then recruited new leadership for a Special Group called Asayb al-Haq or "AAH." *Lee*, 2021 WL 325958, at *4. The Supreme Leader of Iran, Ali Khomeini, "met with [Qais Khazali in Iran] and recruited him to lead [AAH]," which was to "operate without the knowledge or authorization of [Muqtada al-Sadr]." *Fritz*, 320 F. Supp. 3d at 62. AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests." *Lee*, 2021 WL 325958, at *4. Qais Khazali also met with Qods Force officers "on multiple occasions" and his brother, Laith Khazali, effectively served as his deputy. *Fritz*, 320 F. Supp. 3d at 62.

Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. *Karcher*, 396 F. Supp. 3d at 25. Since 2007, Kata'ib Hezbollah had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq," and earned the designation as a Foreign Terrorist Organization in June 2009. *Karcher*, 396 F. Supp. 3d at 25.

Iran also provided money and weapons to al Qa'ida in Iraq ("AQI"). *Attachment B at p.52*. Iran even negotiated prisoner releases of AQI operatives. *Id*. In addition, Iran supported the Assad regime in Syria to maintain the "Shia Crescent" so it could move fighters and weapons to threaten Israeli and American interests. *Attachment B at ¶54*. Syrian intelligence officers not only facilitated al-Qaeda operations in Iraq, but the Syrian border became the principal conduit for foreign terrorists heading into Iraq to join AQI. *Attachment B at ¶55*.

Al-Zarqawi, al-Qaeda's man in Iraq and the godfather of ISIS, received training and funds from the Qods Force in Iran before moving into Afghanistan and then heading al-Qaeda's terrorist operations in Iraq. *Attachment B at ¶58*. The Qods Force provided Zarqawi with funding, weapons, and transportation into Iraq to target U.S. troops. *Attachment B at ¶60*.

Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq. *Lee*, 2021 WL 325958, at *4. Iran also used its resources to support EFP attacks specifically: "one of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs." *Lee*, 2021 WL 325958, at *4. Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys." *Lee*, 2021 WL 325958, at *4. Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month*." *Lee*, 2021 WL 325958, at *4.

Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training. *Karcher*, 396 F. Supp. 3d at 23. The Qods Force provided "Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, [and] mortars[,] [which] have killed thousands of [c]oalition and Iraqi [f]orces," as well as "explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs)... and are specially designed to defeat armored vehicles used by [c]oalition [f]orces." *Fritz*, 320 F. Supp. 3d at 63. Iran smuggled the weapons into Iraq using supply routes called "ratlines," primarily for use by AAH. *Fritz*, 320 F. Supp. 3d at 63. On the Iraqi side, both Qais and Laith Khazali were involved in smuggling arms and artillery from Iran into Iraq. *Fritz*, 320 F. Supp. 3d at 63. Laith Khazali, for example, "was instrumental in acquiring surface-to-air missiles (SAMs), RPGs, bazookas and Stella missiles for [S]pecial [G]roups." *Fritz*, 320 F. Supp. 3d at 63.

At the behest of Iran, Hezbollah created a unit "whose sole purpose was to train Iraqi Shia militants," including AAH, to carry out attacks in Iraq directed at U.S. troops and others. *Fritz*, 320 F. Supp. 3d at 63. In 2005-06, Hezbollah ordered Ali Musa Daqduq, a senior Hezbollah commander, to work with the Qods Force to "provide training and equipment" to the Special Groups, and to "organize the [S]pecial [G]roups in ways that mirrored how Hezbollah was organized in Lebanon." *Fritz*, 320 F. Supp. 3d at 63. Daqduq traveled to Iraq, "met with the commander and the deputy commander of the ... Qods Force special external operations," and "was directed by [the] Qods Force to make trips in and out of Iraq and [to] report on the training and operations of the Iraqi [S]pecial [G]roups." *Fritz*, 320 F. Supp. 3d at 63-64. Daqduq

ultimately made four such trips to "monitor[ ] and report[ ] on the training and arming of [S]pecial [G]roups in mortars and rockets, manufacturing and employment of [IEDs], and kidnapping operations." *Fritz*, 320 F. Supp. 3d at 64.

With Hezbollah's assistance, Iran provided "training at every level of the militant organizations that received assistance, from foot soldier to leadership." *Fritz*, 320 F. Supp. 3d at 64. The leaders of Shia militias, for example, received "administrative, logistics, financial, religious [,] and small unit tactics leadership training." *Fritz*, 320 F. Supp. 3d at 64. AAH members were also given training in engineering, artillery, intelligence, infantry, and kidnapping. *Fritz*, 320 F. Supp. 3d at 64. Much of the training occurred at camps in Iran. *Fritz*, 320 F. Supp. 3d at 64. The Qods Force would train "approximately 20 to 60 Iraqis at a time" in Iran and then send them back to Iraq. *Fritz*, 320 F. Supp. 3d at 64. These individuals, in turn, "passed on this training to additional militants inside Iraq," as part of "a 'train-the-trainer' program." *Fritz*, 320 F. Supp. 3d at 64. The Qods Force and Hezbollah also provided training inside Iraq. *Fritz*, 320 F. Supp. 3d at 64.

By 2007, the Treasury Department found that the Qods Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *Karcher*, 396 F. Supp. 3d at 24. In 2011, the State Department found that Iran was responsible for the increase of lethal attacks on U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed to defeat armored vehicles. *Karcher*, 396 F. Supp. 3d at 24.

**Afghanistan**.  In addition to its activities in Iraq, Iran facilitated the movement of al-Qaeda operatives into Afghanistan and provided them with documents, identification cards, and passports. *Attachment B at ¶¶57-60*.  Iran was a transit point for moving money, arms, and fighters to Pakistan and Afghanistan. *Id*.

According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban. *Fritz*, 320 F. Supp. 3d at 59.  The Qods Force is Iran's primary instrument for providing lethal aid to the Taliban. *Attachment B at ¶61*.  The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. *Id*.

Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and man-portable defense systems to the Taliban. *Attachment B at ¶62*.  The Taliban have conducted training in Iran too. *Id. at ¶69*.  The Qods Force Ansar Corps, the IRGC command responsible for operations in Afghanistan, trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets. *Id*.  General Hossein Musavi was the commander of The Ansar Corps, which supported operations in Afghanistan. *Id*. at ¶68.  In addition to supplying weapons, Iran has trained the Taliban in Iran on small unit tactics to include ambushes, mortar and rocket attacks, IEF, EFPs, sniper operations, and kidnapping operations.  *Id*.

**The Attacks**.

**Attack #1 (June 24, 2004 in Baqubah, Iraq).**  Plaintiffs Ralph Isabella ("Isabella"),

Jeffrey N. Walton ("Walton"), Alan N. Payne ("Payne"), Chad M. Stephens Sr. ("Stephens"), Jerry T. Moorhouse ("Moorhouse"), Thomas Rivera ("Rivera"), Ron Watkins ("Watkins"), Aaron Johnson ("Johnson"), Lynn Sorensen ("Sorensen"), James Cherry ("Cherry"), Roy Farve ("Farve"), and Antonio Fraser ("Fraser") are nationals of the United States and served in the Army National Guard.  *Ex. 11; Ex. 31; Ex. 24; Ex. 29; Ex. 22; Ex. 25; Ex. 33; Ex. 12, Ex. 27; Ex. 2; Ex. 6; Ex. 7; Ex. 19.*  Plaintiffs Daniel Alan Desens, Sr. and Patricia Desens are nationals of the United States and the surviving parents of Daniel Desens, Jr. ("Desens"), who was a national of the United States and served in the Army National Guard.  *Ex. 5.*

On June 24, 2004, Isabella, Walton, Payne, Stephens, Moorhouse, Rivera, Watkins, Johnson, Sorensen, Cherry, Farve, Fraser, and Desens were traveling in a convoy of Bradley Fighting Vehicles in Baqubah, Iraq.  *Ex. 11; Ex. 31; Ex. 24; Ex. 29; Ex. 22; Ex. 25; Ex. 33; Ex. 12, Ex. 27; Ex. 2; Ex. 6; Ex. 7; Ex. 5.*  As the convoy neared the Mufrek Traffic Circle, they were ambushed by machine gun rounds, RPGs, mortars, and a daisy chain of IEDs.  *Id.*  A firefight ensued, requiring additional U.S. forces.  *Id.*  Terrorist militia lead by Al-Zarqawi carried out this 24-hour long attack, which was coordinated with attacks in Fallujah and Al-Najaf.  *Ex. 19.*  Isabella sustained shrapnel wounds, a traumatic brain injury, tinnitus, and PTSD.  *Ex. 11.*  Walton sustained a traumatic brain injury, shrapnel wounds, facial burns, vision loss, tinnitus, and PTSD.  *Ex. 31.*  Payne sustained gunshot wounds to his left arm, shrapnel wounds, and PTSD.  *Ex. 24.*  Stephens sustained shrapnel wounds, burns, vision loss, a spinal cord injury, hearing loss, tinnitus, fibromyalgia, and PTSD.  *Ex. 29.*  Moorhouse sustained a traumatic brain injury, a spinal injury, tinnitus, and PTSD.  *Ex. 22.*  Rivera sustained burn injuries, shrapnel wounds, PTSD, vision loss, a back injury, tinnitus, and injuries to both shoulders, knees, and ankles.  *Ex. 25.*  Watkins sustained a detached retina in his left eye, a traumatic brain injury, and PTSD.  *Ex. 33.*  Johnson sustained blast injuries, traumatic brain injuries, hearing loss, an ankle injury, and PTSD.  *Ex. 12.*  Sorensen sustained injuries to his right knee and left hand, a traumatic brain injury, hearing loss, and PTSD.  *Ex. 27.*  Cherry sustained hearing loss, a traumatic brain injury, a blast injury, vision loss, and PTSD.  *Ex. 2.*  Favre sustained a traumatic brain injury, back injury, hearing loss, and PTSD.  *Ex. 6.*  Fraser sustained a traumatic brain injury, vision loss, and PTSD.  *Ex. 7.*  Desens was struck by small arms fire and RPGs—causing a femoral artery injury which resulted in his death from exsanguination.  *Ex. 5.*

Based upon the evidence, FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks performed Attack #1.  *Attachment B at p.22.*  Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI), created, trained and directed, by Lebanese Hezbollah and Syrian intelligence support networks, was a substantial factor leading to Attack #1.  *Id.*

**Attack #2 (October 2006 in Bagdad, Iraq).**  Plaintiff Bob W. Clements ("Clements") is a national of the United States and served in the Army.  *Ex. 3.*  In October of 2006, Clements was on patrol in Bagdad traveling in a striker vehicle when it detonated an EFP.  *Id.*  Clements was slammed into the deck of the vehicle.  *Id.*  Clements sustained a traumatic brain injury and hearing loss.  *Id.*

Based upon the evidence, IRGC-QF militia AAH performed the Attack #2.  *Attachment B*

*at p.23*. Iran's material support for and resources to IRGC-QF militia AAH was a substantial factor leading to Attack #2. *Id.*

**Attack #3 (October 12, 2008 in Rustamiyah, Iraq).** Plaintiff Jason E. Daniels ("Daniels") is a national of the United States and served in the Army. *Ex. 4*. On October 12, 2008, Daniels was part of a breach team attempting to enter a structure to secure a target in Rustamiyah. *Id*. Upon kicking down the door, there was an explosion that knocked Daniels down and terrorists attacked with RPGs and small arms. *Id*. Daniels sustained blast injuries, shrapnel wounds, fractures in both feet, a back injury, PTSD, a traumatic brain injury, hearing loss, and knee bursitis. *Id*.

Based upon the evidence, to IRGC-QF proxy AAH performed Attack #3. *Attachment B at p.23*. Iran's material support for and resources to IRGC-QF proxy AAH was a substantial factor leading to Attack #3. *Id*.

**Attack #4 (November 14, 2006 in Bagdad, Iraq).** Plaintiff Michelle Garcia is a national of the United States and the surviving spouse of Justin R. Garcia ("Garcia"), who was a national of the United States and served in the Army. *Ex. 8*. On November 14, 2006, Garcia was the gunner in an M1114 Humvee traveling in a convoy from Camp Liberty to FOB Justice when his vehicle was hit by multiple EFPs. *Id*. Garcia was knocked unconscious and pronounced dead from penetrating ballistic injuries. *Id*.

Based upon the evidence, IRGC-QF Proxy AAH performed Attack #4. *Attachment B at p.23-24*. Iran's material support for and resources to IRGC-QF Proxy AAH was a substantial factor leading to Attack #4. *Id*.

**Attack #5 (May 2009 in Sadr City, Iraq).** Plaintiff Jeris T. Holt ("Holt") is a national of the United States and served in the Army. *Ex. 10*. In May of 2009, Holt was the gunner on a HUMVEE patrolling Sadr City. *Id*. An IED struck his vehicle, knocking him unconscious. *Id*. Holt sustained blast injuries, traumatic brain injuries, PTSD, anxiety, depression, and night terrors. *Id*.

Based upon the evidence, IRGC-QF and Lebanese Hezbollah supported AAH performed Attack #5. *Attachment B at p.24*. Iran's material support for and resources to IRGC-QF and Lebanese Hezbollah supported AAH was a substantial factor leading to Attack #5.

**Attack #6 (March of 2011 in Kadhimiya district of Bagdad, Iraq).** In March of 2011, Holt's unit responded to an explosion at a car dealership in Bagdad. *Ex. 10*. While securing the area, additional IEDs were detonated, and one blast knocked Holt down. *Id*. Holt sustained blast injuries, traumatic brain injuries, PTSD, anxiety, depression, and night terrors. *Id*.

Based upon the evidence, IRGC-QF and Lebanese Hezbollah supported AAH performed Attack #6. *Attachment B at p. 24*. Iran's material support for and resources to IRGC-QF and Lebanese Hezbollah supported AAH was a substantial factor leading to Attack #6. *Id*.

**Attack #7 (December of 2004 in Iraq).** After the June 24, 2004, attack, Johnson was

involved in another attack in December of 2004 near FOB Caldwell. *Ex. 12*. Johnson was driving a Humvee in a convoy, noticed something in the road, turned his vehicle, and an IED exploded. *Id*. Johnson sustained blast injuries, traumatic brain injuries, hearing loss, an ankle injury, and PTSD. *Id*.

Based upon the evidence, FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah performed Attack #7. *Attachment B at p. 24*. Iran's material support for and resources to those insurgent groups was a substantial factor leading to Attack #7. *Id*.

**Attack #8 (June 18, 2004 north of Samarra, Iraq)** Plaintiff Brent Jurgersen ("Brent Jurgersen") is a national of the United States and served in the Army. *Ex. 13*. On June 18, 2004, Brent Jurgersen was part of an engineering mission north of Samarra to reduce berms that insurgents had used to bury IEDs. *Id*. During that mission, Brent Jurgersen's unit came under attack. *Id*. A bullet, along with fragments of his M-16, struck Brent Jurgersen in the upper lip, broke seven of his teeth, chipped other teeth, shredded his tongue, and lodged in the back of his throat. *Id*.

Based upon the evidence, FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah performed Attack #8. *Attachment B at p.25*. Iran's material support for and resources to those insurgent groups was a substantial factor leading to Attack #8. *Id*.

**Attack #9 (January 26, 2005 in Ad Duluiyah, Iraq).** After recovering from the June 18, 2004 attack, Brent Jurgersen returned to Iraq. *Ex. 13*. On January 26, 2005, Brent Jurgersen was part of a recon patrol in Ad Duluiyah inspecting polling sites before the Iraqi national election. *Id*. After inspecting the second polling site, Brent Jurgersen's HMMWV was hit by two armor piercing RPGs. *Id*. Brent Jurgersen sustained facial trauma, dental trauma, an open compressed skull fracture with a brain hematoma, a traumatic brain injury, an above the knee amputation of his left leg, a right knee injury, an open fracture of his right hand and ring finger, detrusor instability, lumbar spine injury, left elbow fracture, right shoulder injury, numerous shrapnel wounds and burns, PTSD, sleep apnea, tinnitus, hearing loss, and vision problems. *Id*.

Based upon the evidence, FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah performed Attack #9. *Attachment B at pp. 25-26*. Iran's material support for and resources to those insurgent groups was a substantial factor leading to Attack #9. *Id*.

**Attack #10 (July 1, 2004 in Baqubah, Iraq).** Plaintiff Jeffrey A. Leake ("Leake") is a national of the United States and served in the Army National Guard. *Ex. 15*. On July 1, 2004, Leake was traveling in an M113 Armored Personnel Carrier conducting a routine clearing mission in Baqubah. *Id*. An IED hit his APC. *Id*. The detonation resulted in a traumatic brain injury, vision loss, migraines, and PTSD. *Id*.

Based upon the evidence, IRGC-QF Proxy AAH performed Attack #10. *Attachment B at p. 26*. Iran's material support for and resources to IRGC-QF Proxy AAH was a substantial factor

leading to Attack #10.  *Id*.

**Attack #11 (February 7, 2007 in Mosul, Iraq).**  Plaintiff Joe Markell ("Markell"), Kyle Lewis ("Lewis"), Bradley Spry ("Spry"), Jarrett H. Taylor ("Taylor") are nationals of the United States and served in the Army.  *Ex. 17a; Ex. 16; Ex. 28; Ex. 30*.  On February 7, 2007, Markell, Lewis, Spry, and Taylor were traveling in a convoy of Humvees through Mosul.  *Id*.  An EFP struck the rear vehicle, causing the other vehicles to stop.  *Id*.  The photos attached to the Veterans' Declarations in this attack show an EFP with a copper plate.  *Id*.  Then a secondary IED hit the lead vehicle and the convoy was hit by small arms fire.  *Id*.  Markell sustained traumatic brain injuries, tinnitus, and PTSD.  *Ex. 17a*.  Lewis sustained traumatic brain injuries, chronic hip pain, tinnitus, and PTSD.  *Ex. 16*.  Spry sustained traumatic brain injuries, back and neck injuries, tinnitus, and PTSD.  *Ex. 28*.  Taylor sustained traumatic brain injuries, right upper extremity radiculopathy, neck pain, right knee pain, tinnitus, and PTSD.  *Ex. 30*.

Based upon the evidence, IRGC-QF and Lebanese Hezbollah performed Attack #11.  *Attachment B at p. 27*.   Iran's material support for and resources to IRGC-QF Special Groups and Lebanese Hezbollah was a substantial factor leading to Attack #11.  *Id*.

**Attack #12 (May of 2007 in northern Iraq).**  A few months later, Markell, Lewis, Spry, and Taylor were traveling in a Humvee near Tal Afar when their vehicle was hit by a large IED at very close range.  *Ex. 17a; Ex. 16; Ex. 28; Ex. 30*.  Markell sustained traumatic brain injuries, tinnitus, and PTSD.  *Ex. 17a*.  Lewis sustained traumatic brain injuries, chronic hip pain, tinnitus, and PTSD.  *Ex. 16*.  Spry sustained traumatic brain injuries, back and neck injuries, tinnitus, and PTSD.  *Ex. 28*.  Taylor sustained traumatic brain injuries, right upper extremity radiculopathy, neck pain, right knee pain, tinnitus, and PTSD.  *Ex. 30*.

Based upon the evidence, FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah performed Attack #12.  *Attachment B at pp.27-28*.   Iran's material support for and resources to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah was a substantial factor leading to Attack #12.  *Id*.

**Attack #13 (November 14, 2006 in Baqubah, Iraq).**  Plaintiff Daniel T. Mayer ("Mayer") is a national of the United States and served in the Army.  *Ex. 18*.  Around November 14, 2006, Mayer was driving an RG-31 MRAP vehicle on patrol in Baqubah when it was hit by two terrorist RPGs.  *Id*.  Mayer sustained a traumatic brain injury.  *Id*.  Defendant's material support or resources was a substantial factor leading to Attack #13.  *Attachment B at p. 28*.

Based upon the evidence, to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah lethal aid and material support through both the Sunni and Shia performed Attack #13.  *Id*.  Iran's material support for and resources to those insurgent groups was a substantial factor leading to Attack #13.  *Id*.

**Attack #14 (September 10, 2004 in the Diyala Province, Iraq).**  Don McCallum ("McCallum") was part of main supply route recon just north of Baqubah in Diyala Province, Iraq.  *Ex. 19*.  Upon discovering some suspicious disturbed dirt, McCallum's Bradley Fighting

Vehicle stopped to change direction when it denoted an IED anti-tank mine. *Id*. Immediately after the explosion, the insurgents attacked with small arms fire. *Id*. McCallum sustained traumatic brain injuries, injuries to both legs, a back injury, PTSD, and an assortment of related health problems resulting from his injuries. *Id*.

Based upon the evidence, FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah, performed Attack #14. *Attachment B at pp.28-29*. Iran's material support for and resources to the FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah was a substantial factor leading to Attacks #14. *Id*.

**Attacks #15 (November 30, 2006 in Mosul, Iraq).** Plaintiff Dillon J. McNeeley ("McNeeley") is a national of the United States and served in the Army. *Ex. 20*. On November 30, 2006, McNeeley was driving an Army truck conducting security for an engineering unit on a road called "Santa Fe." *Id*. It was dark when the truck was hit by a roadside bomb. *Id*. After the explosion, the truck was ambushed by small arms fire. *Id*. With a fellow serviceman badly injured, McNeeley was covered in blood and drove the truck, with three blown out tires, out of the kill zone back to the hospital. *Id*. McNeeley sustained hearing loss and PSTD. *Id*.

Based upon the evidence, the FTO al-Qaeda in Iraq supported by IRGC-QF lethal aid, and IRGC-QF facilitation of foreign fighters into Iraq through Iran's main Arab ally – Syria - using Lebanese Hezbollah and Assad's intelligence network to move fighters into Iraq performed Attack #15. *Attachment B at p. 29*. Iran's material support for and resources to FTO al-Qaeda in Iraq supported by IRGC-QF lethal aid IRGC-QF facilitation of foreign fighters into Iraq through Iran's main Arab ally – Syria - using Lebanese Hezbollah and Assad's intelligence network to move fighters into Iraq was a substantial factor leading to Attacks #15. *Id*.

**Attacks #16 (July 2007 in Mosul, Iraq).** Approximately eight months later, McNeeley was part of a truck convoy headed toward Bodoush prison in Mosul. *Ex. 20*. When McNeeley's truck turned left on "Santa Fe," the truck was hit by a roadside bomb. *Id*. Immediately after the explosion, the convoy was ambushed with RPGs and small arms fire. *Id*. McNeeley sustained hearing loss and PSTD. *Id*.

Based upon the evidence, the FTO al-Qaeda in Iraq supported by IRGC-QF lethal aid, and IRGC-QF facilitation of foreign fighters into Iraq through Iran's main Arab ally – Syria - using Lebanese Hezbollah and Assad's intelligence network to move fighters into Iraq performed Attack #16. *Attachment B at pp. 29-30*. Iran's material support for and resources to the Sunni insurgency was a substantial factor leading to Attacks #16. *Id*.

**Attack #17 (Explosive Ordinance Disposal Duties in 2006-2007 in Mosul, Iraq).** Plaintiff Francisco E. Miguel ("Miguel") is a national of the United States and served in the Army. *Ex. 21*. Between November of 2006 and January of 2007, Miguel provided escort services for Explosive Ordnance Disposal personnel, who located, defused, and/or detonated EFPs, IEDs, and other road-side bombs planted by terrorists around Mosul. *Id*. During that time, Miguel was exposed to blasts from that weaponry. *Id*. Miguel sustained hearing loss, tinnitus, and PTSD. *Id*.

Based upon the evidence, IRGC-QF support to both Shia and Sunni groups performed Attack #17. *Attachment B at p. 30*. Iran's material support for and resources to IRGC-QF support to both Shia and Sunni groups was a substantial factor leading to Attack #17. *Id*.

**Attack #18 (February 15, 2011 near Kalsu, Iraq).** Plaintiff Zachary Carl Roth ("Roth") is a national of the United States and served in the Army. *Ex. 26*. On February 15, 2011, he was driving an M1151 Enhanced Armament Carrier on a main supply route from Al-Hillah to Bagdad for a mission to gather evidence from a previous EFP attack. *Id*. After passing through an Iraqi police checkpoint, an EFP was remotely detonated near his vehicle. *Id*. The EFP was covered by a mound of dirt in the middle of the road. *Id*. The detonation caused the vehicle to roll and flip violently. *Id*. Roth sustained a traumatic brain injury, a back injury, an ankle injury, and PTSD from the attack. *Id*.

Based upon the evidence, AAH performed Attack #18. *Attachment B at p. 30-31*. Iran's material support for and resources to AAH was a substantial factor leading to Attack #18. *Id*.

**Attack #19 (June 2003 near Kirkuk Province, Iraq).** Plaintiff Jonas Ware ("Ware") is a national of the United States and served in the Army. *Ex. 32*. In June of 2003, Ware was driving a HUMVEE as part of a return supply convoy near Al Hawija when an IED detonated in front of his vehicle. *Id*. About a month later, Ware was traveling along the same route when another IED struck his HUMVEE. *Id*. Holt sustained traumatic brain injuries, hearing loss, tinnitus, and PTSD. *Id*.

Based upon the evidence, to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah, performed Attack #19. *Attachment B at p. 31*. Iran's material support for and resources to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah was a substantial factor leading to Attack #19. *Id*.

**Attack #20 (August 2003 near Al Hawija, Iraq)**

About a month later, Ware was traveling along the same route when another IED struck his HUMVEE. *Id*. Holt sustained traumatic brain injuries, hearing loss, tinnitus, and PTSD. *Id*.

Based upon the evidence, to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah, performed Attack #20. *Attachment B at pp. 31-32*. Iran's material support for and resources to the to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah was a substantial factor leading to Attack #20. *Id*.

**Attack #21 (June 6, 2004 in the Abu-Ghraib District, Iraq).** Plaintiff Lloyd Williams ("Williams") is a national of the United States and served in the Marine Corps. *Ex. 34*. On June 6, 2004, Williams was traveling in a convoy of Humvees returning to his base from Abu-Ghraib. *Id*. An IED hit Williams' Humvee, causing it to crash. *Id*. Williams was hit by shrapnel and lost consciousness from the blast. *Id*. The detonation resulted in a traumatic brain injury,

shrapnel injury to his left hand, PTSD, tinnitus, and bipolar disorder.  *Id.*

Based upon the evidence, the FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks, performed Attack #21.  *Attachment B at p. 32*.  Iran's material support for and resources to FTO al-Qaeda in Iraq (AQI) and its affiliates supported by IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks was a substantial factor leading to Attack #21.  *Id*.

**Attack #22 (February 8, 2007 in Hassa, Iraq).**  Plaintiff James R. Williamson ("Williamson") is a national of the United States and served in the Marine Corps.  *Ex. 35.*  On February 8, 2007, Williamson participated in a sweep of Hassa, part of a key route for the flow of enemy foreign fighters, weapons, and munitions into Iraq.  *Id*.  While moving his LAV-25 into position, insurgents launched an anti-personnel RPG which hit William's vehicle, helmet, protective glasses, left check, and wrist.  *Id*.  The attack resulted in temporomandibular joint disorder and PTSD.  *Id.*

Based upon the evidence, FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah performed Attack #22.  *Attachment B at p. 33*.  Iran's material support for and resources to FTO al-Qaeda in Iraq and its affiliates under the Islamic State of Iraq aided by IRGC-QF and Lebanese Hezbollah was a substantial factor leading to Attack #22.  *Id*.

**Attack #23 (March 9, 2011 in Kajaki District, Afghanistan).**  Plaintiff Robert S. Bruce ("Bruce") is a national of the United States and served in the Marine Corps.  *Ex. 1.*  Afghan village elders had alerted Afghan National Police that Taliban forces had placed IEDs on Devin Hill, a small hill in the middle of a village referred to as "SK."  *Id*.  On March 9, 2011, Bruce was a squad leader assigned to sweep Devin Hill for IEDs.  *Id*.  IEDs were made from random materials and ordnance, but most had a pressure plate trigger consisting of wood and fine copper wire.  *Id*.  After a member of his squad triggered an IED, Bruce moved toward the injured Marine to render aid.  *Id*.  After a few steps, another IED detonated under Bruce.  *Id.*  The detonation resulted in the amputation of both of Bruce's legs below the knee, fragmentation wounds to his upper legs and buttocks, a traumatic brain injury, back pain, tinnitus, hearing loss, and PTSD.  *Id.*

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #23.  *Attachment B at p. 35*.  Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #23.  *Id*.

**Attack #24 (July 2013 near Puli Alam, Afghanistan).**  In July of 2013, Holt's unit was returning to base on foot near Puli Alam, Afghanistan when terrorists attacked with rockets.  *Ex. 10*.  The blasts knocked Holt down but killed some fellow service members.  *Id*.  Holt sustained blast injuries, traumatic brain injuries, PTSD, anxiety, depression, and night terrors.  *Id*.

Based upon the evidence, the IRGC-QF and MOIS Lethal Aid to the Taliban performed

Attack #24.  *Attachment B at pp. 35-36*.   Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #24.  *Id*.

**Attack #25 (2007-2008 in Afghanistan).**  Plaintiff Chase Jurgersen ("Chase Jurgersen") is a national of the United States and served in the Army.  *Ex. 14*.  From August of 2007 until August of 2008, Chase Jurgersen was a member of the 173 Airborne, 1-91 Cav Regiment serving in the Kunar and Nuristan provinces of Afghanistan.  *Id*.  Chase Jurgersen was airlifted into areas to secure terrains, trained Afghan locals, and provided security for road repairs.  *Id*.  Throughout this time, Chase Jurgersen repeatedly came under attack by terrorists armed with RPGs, rockets, mortars, and small arms.  *Id*.  He witnessed an unbelievable amount of carnage and death to his fellow servicemen, Afghan locals, and contractors.  *Id*.  Chase Jurgersen sustained a traumatic brain injury, PTSD, hearing loss, tinnitus, and back injuries.  *Id*.

Based upon the evidence, IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #25.  *Attachment B at p. 36*.  Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #25.  *Id*.

**Attack #26 (November of 2012 in Kandahar, Afghanistan).**  A few years later, Chase Jurgersen returned to Afghanistan with the 3rd Brigade, 2nd Infantry, 8-1 Cav Regiment.  *Ex. 14*.  In November of 2012, Chase Jurgersen was manning the gun turret in a striker vehicle while clearing a dry riverbed.  *Id*.  The truck in front was hit by an IED.  *Id*.  Chase Jurgersen sustained a traumatic brain injury, PTSD, hearing loss, tinnitus, and back injuries.  *Id*.

Based upon the evidence, IRGC-QF and MOIS Lethal Aid to the Taliban performed Attack #26.  *Attachment B at pp. 36-37*.  Iran's material support for and resources to the Taliban was a substantial factor leading to Attack #26.  *Id*.

**This Lawsuit**.  On March 20, 2020, Plaintiffs filed their Third Amended Complaint. [Doc. 27].  That complaint and summons were delivered to the Iranian Ministry of Foreign Affairs on October 5, 2020.  [Doc. 37].  The clerk issued a default on December 9, 2020.  [Doc. 39].  In response to questions raised at a Court hearing on January 24, 2022 and outlined in the subsequent Order dated February 7, 2022 [Doc. #88], Plaintiffs filed a motion in support of the entry of default judgment against the Islamic Republic of Iran ("Iran"). [Doc. XX]

## CONCLUSIONS OF LAW

Having made findings of fact, the court next answers three questions of law: (1) whether there is subject matter jurisdiction over the dispute; (2) whether the court has personal jurisdiction over Iran; and (3) whether Iran is liable for Plaintiffs' injuries.

**Subject Matter Jurisdiction**.  The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hesse Shipping Corp.*, 488 U.S. 428, 434 (1989). "Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions ...." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  Pursuant to what is known as the terrorism exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

There is no doubt that Plaintiffs seek money damages against a foreign state. [Doc. #27]. Plaintiffs seek to recover for their personal injuries, including "their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses …." [Doc. #27 ¶388]. In addition, Plaintiffs' claims are predicated on Iran's "material support or resources" for an extrajudicial killing.

An "extrajudicial killing" is a killing, that is deliberated, and is not authorized by a previous judgment pronounced by a regularly constituted court or lawfully carried out under authority of a foreign nation. 28 U.S.C. § 1605A(h)(7); *Owens*, 864 F.3d at 770. An extrajudicial killing includes "'deliberated' attempts to kill …." *Karcher*, 396 F. Supp. 3d at 58 (citing *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)). As a result, a court has jurisdiction "where a designated state supplies material resources in an attempt to commit an extrajudicial killing." *Lee*, 2021 WL 325958, at *12.

The attacks at issue all involved extrajudicial killings. While Attack #1 and Attack #4 resulted in deaths, the evidence confirms that each attack was, at a minimum, an attempt to kill. Furthermore, a "'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Lee*, 2021 WL 325958, at *12. The evidence confirms that each attack involved deliberate and strategic attempts to kill. There is simply no evidence to suggest that any of these attacks were "on a sudden impulse;" rather, they were all part of a terror campaign. Finally, there is no evidence that the attempted killings were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation.

The FSIA next requires that an official or agent of Iran provided "material support or resources" to the people who carried out the attacks at issue. 28 U.S.C. § 1605A(a)(1).

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation, except medicine or religious materials[.]

28 U.S.C. § 1605A(h)(3) (adopting the definition of 18 U.S.C. § 2339A(b)(1)). The evidence contains numerous examples of Iran funneling material support and resources through its

Ministry of Intelligence and Security and its Qods Force to terrorist proxies in Iraq and Afghanistan. The Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55. This material support manifested as millions of dollars of funding, training, and advanced weaponry. *Lee*, 2021 WL 325958, at *13.

The FSIA also requires that Iran's "provision of material support or resources" caused Plaintiffs' "personal injury or death." 28 U.S.C. § 1605A(a)(1). The touchstone of proximate causation is the existence of "'some reasonable connection between the act ... of the defendant and the damage which the plaintiff has suffered.'" *Owens*, 864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128). "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury. Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.*

Plaintiffs have satisfied both components of proximate cause. First, Iran's support and resources were "substantial factors" leading to Plaintiffs' injuries because Iran provided the funding, training, and weaponry that was used to kill and/or injure Plaintiffs. Second, Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's conduct. It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq and Afghanistan that Iran reasonably anticipated—and indeed, intended—that its support and resources would lead to death and serious injury. *See Karcher*, 396 F. Supp. 3d at 56–57 (finding harm to plaintiffs was reasonably foreseeable consequence when Iran intended "to kill people, not just disable vehicles"); *see also Owens*, 864 F.3d at 797–98 (finding bombings were reasonably foreseeable consequence of Sudan's provision of "opportunities" to al-Qaeda and Osama bin Laden (internal quotation marks omitted)). Likewise, the suffering of the families of victims of Iran-supported attacks was a reasonably foreseeable consequence of Iran's support and resources for terrorist attacks in Iraq and Afghanistan. *See Salzman*, 2019 WL 4673761, at *14 (finding "the related suffering of [victims'] family members" was "reasonably foreseeable").

Finally, a court shall hear the claim if: (1) "the foreign country was designated a state sponsor of terrorism" at the time of the act, due to the act, or within 6 months before the claim was filed, 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) the claimant or the victim was a national, member of the armed forces, or an employee or contractor of the United States at that time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III); and (3) the claimant afforded the foreign state a reasonable opportunity to arbitrate when "the act occurred in the foreign state …." 28 U.S.C. § 1605A(a)(2)(A)(iii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13-14 (D.C. Cir. 2015). Plaintiffs satisfy these requirements too. First, Iran has been continuously designated as a state sponsor of terrorism since 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2,836, 2,836 (Jan. 23, 1984). Second, Plaintiffs have submitted under seal documentation establishing that they are U.S. nationals and/or served in the armed forces. *See Exs. 1-35*. Third, all of the acts Plaintiffs complained of occurred in Iraq or Afghanistan—not Iran—so the requirement to afford Iran the opportunity to arbitrate is not implicated here.

The court therefore concludes that Iran's material support for the extrajudicial killing involved in the attacks proximately caused Plaintiffs' injuries, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1).

**Personal Jurisdiction**. As with subject matter jurisdiction, the court has "an independent obligation ... to satisfy itself of its personal jurisdiction before entering a default against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018). Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608. 28 U.S.C. § 1330(b). "In other words, under the FSIA, subject matter jurisdiction plus service of process equals jurisdiction." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted).

The FSIA provides four means for serving a foreign state. *See* 28 U.S.C. § 1608(a). First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* § 1608(a)(1). If service cannot be made under such an arrangement, then the plaintiff may affect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). If the plaintiff cannot serve the defendant via the first two methods, then the plaintiff must attempt to effect service "by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). If, after thirty days, service cannot be affected by this third option, the plaintiff must attempt service through diplomatic means. To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint, and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4). The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Plaintiffs could not serve Iran under the first two mechanisms of service, as the United States and Iran do not have a "special arrangement" for service and "'Iran is not party to an international convention on service of judicial documents.'" *Salzman*, 2019 WL 4673761, at *15 (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)). Plaintiffs therefore first attempted to effect service under the third mechanism—via registered mail with return receipt requested. [Doc. 17]. When Iran did not respond after 30 days, Plaintiffs served Iran via diplomatic channels. [Doc. 39]. Under 28 U.S.C. § 1608(c)(1), service was deemed effected "as of the date of transmittal indicated in the certified copy of the diplomatic note"—in this case, October 5, 2020. Accordingly, this court finds that Plaintiffs properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

Because the court concludes that it has subject matter jurisdiction and Plaintiffs have properly effected service, the court likewise has personal jurisdiction over Iran. *See GSS Grp.*, 680 F.3d at 811.

**Liability**.  Plaintiffs bring their claims under 28 U.S.C. § 1605A(c).  [Doc. 27].  Section 1605A(c) provides that "[a] foreign state that is or was a state sponsor of terrorism" and any of its agents are liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c).

Liability is limited, however, to U.S. nationals, members of the armed forces, employees or contractors of the U.S. government, and legal representatives of any of those individuals.  *Id.*  The court has already found that Plaintiffs satisfied this requirement.

With regard to liability, "[t]here is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Salzman*, 2019 WL 4673761, at *15 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87; *Lee*, 2021 WL 325958, at *15.  The court has already concluded that it has subject matter jurisdiction over Plaintiffs' claims under the terrorism exception.  Accordingly, the court also concludes that Iran is liable for Plaintiffs' injuries under 28 U.S.C. § 1605A(c).

In finding that Iran is liable for Plaintiffs' injuries, the court also takes judicial notice pursuant to Federal Rule of Evidence 201(b) of *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB and *Selig v. Islamic Republic of Iran*, 2021 WL 5446870, ---- F.Supp.3d ---- (D.D.C. November 22, 2021).  In both cases, the court found Iran had provided material support to the Taliban in Afghanistan.

Moreover, FSIA § 1605A(c) requires Plaintiffs "to prove a theory of liability" that justifies holding Iran liable for their injuries. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012).  Courts define the theory of "personal injury" needed to prevail on a § 1605A(c) claim by looking to "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to define the elements and scope of these theories of recovery." *Oveissi, supra at 54;* see also *Fraenkel v. Islamic Repub. of Iran, et al.,* 892 F.3d 348, 353 (D.C. Cir. 2018).  Plaintiffs have presented overwhelming evidence that Iran provided material support for the attacks that caused Plaintiffs' harm.  These terrorist acts include conduct that satisfies all the elements of the Plaintiffs' tort claims for assault, battery, and intentional infliction of emotional distress, according to the elements articulated by the Restatement (Second) of Torts. Am. Compl. ¶¶ 34-39.

## **ORDER**

For the foregoing reasons, the court grants Plaintiffs' motion for default judgment against Defendant. Having found that Defendant is liable, this case shall proceed to the determine the damages of Plaintiffs.

SIGNED this _____ day of _____, 2022.

_____
UNITED STATES DISTRICT JUDGE

Distribution list:

To all registered counsel by CM/ECF

Bradley M. Lakin
Bradl@slchapman.com