**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ZACHARY CARL ROTH, *et al.*,**

Plaintiffs,

v.

**ISLAMIC REPUBLIC OF IRAN**,

Defendant.

---

Case No. 1:19-cv-02179-TNM

**MEMORANDUM OPINION\***

This civil action for compensatory and punitive damages arises under the terrorism

exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.  Plaintiffs sue the

Islamic Republic of Iran for personal injury and solatium damages.  They allege that Iran

provided material support and resources to multiple terrorist organizations in Iraq and

Afghanistan that perpetrated various attacks injuring them or their family members.

Iran did not respond, and Plaintiffs now move for default judgment as to liability.[1]  The

Court finds that Plaintiffs have successfully established personal and subject matter jurisdiction

under § 1605A for most alleged attacks.  And Plaintiffs have proven that Iran committed assault,

battery, and intentional infliction of emotional distress.  Plaintiff GG, however, has not provided

---

\* This is a redacted version of a sealed Opinion issued on December 28, 2022.  In this version,
the Court replaces Plaintiffs' names with letters of the alphabet to protect their privacy in light of
the sensitive medical information they provide.

[1] Plaintiffs previously filed a motion seeking appointment of a special master to assess damages,
*see* ECF No. 95, which the Court denied as premature.  Plaintiffs may renew that motion now
that the Court has found Iran liable.

1

the Court with enough evidence to assure it that Iran proximately caused one of the two attacks in which he was injured.  The Court will therefore grant Plaintiffs' motion for default judgment in large part but will deny it as to that one attack.

## I.    BACKGROUND

At issue are 26 attacks that occurred in Iraq and Afghanistan between 2003 and 2013. *See* Exp. Witness Rep. of Michael Pregent (Pregent Rep.) at 22–33, 35–37, ECF No. 91-2. Plaintiffs allege that so-called Shia Special Groups and al-Qaeda in Iraq and the Taliban in Afghanistan committed the attacks with Iranian "material support and resources."  *See* Third Am. Compl. (Compl.) ¶¶ 17–46.  The Foreign Sovereign Immunities Act (FSIA) "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . [but] that grant of immunity is subject to a number of exceptions."  *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  One of these exceptions, known as the "terrorism exception," waives sovereign immunity for countries that provide material support to terrorist organizations.  *See* 28 U.S.C. § 1605A.  Plaintiffs bring their case under this exception.  *See* Compl. ¶ 1.

Because Iran did not respond, Plaintiffs move for default judgment.  Before the Court can enter default judgment, Plaintiffs must establish subject matter and personal jurisdiction. *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014).  Section 1605A provides a mechanism for Plaintiffs to show both types of jurisdiction over a non-responsive foreign sovereign.  The Court's analysis thus focuses on whether Plaintiffs have properly pled all elements of a claim under § 1605A.  To do this, Plaintiffs must identify the terrorist groups responsible for the attacks and show that Iran supported them.

Plaintiffs do this in two ways.  *First*, they provide expert testimony.  Plaintiffs' expert, former U.S. intelligence officer Michael Pregent, submitted a report and testified at an evidentiary hearing.  *See generally* Pregent Rep.; Tr. of Evidentiary Hr'g (Hr'g Tr.), ECF 102. At that hearing, the Court recognized Pregent as an expert within the field of military intelligence, terrorism, and counterterrorism under Federal Rule of Evidence 702.  *See* Hr'g Tr. at 19.  Pregent has submitted reports and testified in three other FSIA cases in this district involving Iran and provided declarations in two others related to Yemen.  *See* Hr'g Tr. at 12–13; *see also, e.g.*, *Frost v. Islamic Repub. of Iran*, 383 F. Supp. 3d 33, 38 (D.D.C. 2019) (qualifying Pregent as an expert on "Iranian influence in Iraq"); *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12, 19 (D.D.C. 2019) (qualifying Pregent to testify "regarding 'intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field'").  In FSIA cases, expert testimony is often sufficient for plaintiffs to meet their burden because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020).

*Second*, Plaintiffs ask the Court to take judicial notice of prior decisions by courts in this district that have held Iran responsible under § 1605A on similar facts.  *See* Pls.' Mem. in Supp. of Pls.' Mot. for Default J. (Pls.' Mem.) at 3–4, ECF No. 91.  Federal Rule of Evidence 201(b) permits courts to take judicial notice of facts that are "not subject to reasonable dispute" and that are "either (1) generally known within the territorial jurisdiction . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In FSIA litigation, courts can "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Rimkus v. Islamic Repub. of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). The Court therefore takes judicial notice of these cases: *Cabrera v. Islamic Repub. of Iran*, No. 19-cv-3835, 2022 WL 2817730 (D.D.C. July 19, 2022); *Selig v. Islamic Repub. of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021); *Fritz v. Islamic Repub. of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018); *Frost*, 383 F. Supp. 3d 33; *Karcher*, 396 F. Supp. 3d 12; *Karcher v. Islamic Repub. of Iran*, No. 16-cv-232, 2021 WL 133507 (D.D.C. Jan. 14, 2021); *Lee v. Islamic Repub. of Iran*, No. 19-cv-00830, 2021 WL 325958 (D.D.C. Feb. 1, 2021). This is not to say that the Court automatically accepts all findings or assertions in these prior cases; it merely considers relevant findings from them when evaluating Plaintiffs' burdens here.

The Court assesses this evidence and makes findings of fact before proceeding to its conclusions of law.

## II.    FINDINGS OF FACT

### A.    The Beginning of Iran's Support for Terrorism

Modern Iran began with the 1979 revolution. *See Karcher*, 396 F. Supp. 3d at 22. Ayatollah Khomeini established himself as Supreme Leader and created the Islamic Revolutionary Guard Corps (IRGC) to prevent "backsliding in implementing his vision for an Islamic theocratic government." *Id.* In Khomeini's vision, the conventional Iranian military would protect Iran's borders while the IRGC "protect[ed] the revolution." *Id.* Khomeini also established the Quds Force, an arm of the IRGC responsible for its international operations. *Id.* It "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government."

*Lee*, 518 F. Supp. 3d at 482.  The Quds Force "is responsible to and directed by the Supreme Leader of Iran."  *Frost*, 383 F. Supp. 3d at 39.  As Plaintiffs' expert explained, the Quds force is "a hybrid . . . intelligence service and special operations service.  And it is one of the most capable entities that the U.S. military has faced."  Hr'g Tr. at 8.

One of the terrorist movements the Quds Force supports is Hezbollah, a Lebanese terrorist organization.  Hezbollah is the Quds Force's "premier proxy" in the Middle East.  Pregent Rep. at 7.  "In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran bankrolled, armed, and trained Hezbollah."  *Lee*, 518 F. Supp. 3d at 482.  In 2018, experts estimated that "Iran provides Hezbollah with as much as $700 million–$1 billion per year in the form of cash, training, intelligence, and weapons."  *Fritz*, 320 F. Supp. 3d at 60 (cleaned up).  "Hezbollah envisions itself as 'the sharp end of the spear, going where Iran tells it to go in defense of . . . Shia Muslims around the world.'"  *Id.* (cleaned up).  Hezbollah has carried out multiple attacks on Americans at Iran's behest.  *See id.*

Hezbollah also provided vital support to terrorist groups in Iraq and Afghanistan.  Beginning in the early 1990s, al-Qaeda leaders secretly traveled to Iran to meet with Hezbollah.  *See* Pregent Rep. at 7–9.  For example, al-Qaeda principal Ayman al-Zawahiri "made a secret visit to Iran to ask for help in al-Qaeda's campaign to overthrow the government of Egypt" in 1991.  *Id.* at 7.  At that meeting, al-Zawahiri met with Hezbollah's chief of terrorist operations.  *See id.*  The Hezbollah chief persuaded al-Zawahiri that suicide bombings—which al-Qaeda had frowned upon for religious reasons—were "justified [] as an appropriate act of a jihad warrior."  *Id.* at 8.

Several years later, Osama bin Laden and other senior al-Qaeda leaders met with Iranian officials and the terrorist operations chief for Hezbollah in Sudan to discuss a terrorism alliance.

*See id.* After the meeting, bin Laden began sending terrorist operatives to train at Hezbollah camps in both Lebanon and Iran. *See id.* This arrangement continued for a decade. *See id.* And starting in 1995, the Quds Force began teaching al-Qaeda operatives in Lebanese training camps how to make better explosive devices and other weapons that terrorists would later use in Afghanistan and Iraq. *See id.* at 9. Iran's Supreme Leader approved of the Iranian Hezbollah terrorist training programs. *See id.* at 8.

### B. Iran's Role in Iraq

Iran's proxies were already active in Iraq when American and coalition forces entered to topple Saddam Hussein. *See Lee*, 518 F. Supp. 3d at 482. The same month that the United States began its attack, Iran freed many Sunni jihadists that it had been holding captive and sent them to Iraq to battle the U.S. military.[2] *See* Pregent Rep. at 9; *see also* Hr'g Tr. at 26. The Quds Force then provided Abu Musab al-Zarqawi (a Jordanian jihadist leader), with funds and weapons, all while facilitating his safe passage into Iraq to fight the U.S. forces. *See* Pregent Rep. at 9; *see also* Hr'g Tr. at 26–27. The goal: "providing material support, financing, funding, training, and weapons to al-Qaeda to attack, kill[,] and injure Americans[.]" Hr'g Tr. at 27. A few months later, bin Laden began sending $1.5 million a month to Iraqi insurgents, including al-Zarqawi who then led al-Qaeda in Iraq (AQI). *See* Pregent Rep. at 10.

Iran moved quickly to exploit the power vacuum following Saddam Hussein's defenestration. *See Lee*, 518 F. Supp. 3d at 483. Iran "sought to install weakened, decentralized, and Shia-dominated leadership in Iraq and therefore set out to foster unity among Iraq's various

---

[2] Islam has two major branches: Shia and Sunni Islam. *See Frost*, 383 F. Supp. 3d at 39. Though Iran is mostly Shia and the intelligence community historically thought its goal was to "spread[] the Shia revolution," Plaintiffs' expert explained that the Quds force helped Sunni groups so long as they acted against the United States. *See* Hr'g Tr. at 8–9.

Shia parties and movements so that it could consolidate Shia political control . . . over the new Iraqi government." *Id.* (cleaned up). Simultaneously, Iran devoted considerable effort to pushing the United States out of the country. *See Fritz*, 320 F. Supp. 3d at 61. Seeing the American forces active in nearby countries—Iraq and Afghanistan—Iranian leaders worried their country would be next. *See* Hr'g Tr. at 23. But "[i]f the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the Gulf region in the future." *Fritz*, 320 F. Supp. 3d at 61 (cleaned up). Iran's proxies were vital to this strategy because Iran did not want a direct conflict with U.S. and coalition forces. *See id.*

Over time, Iran began to recruit leadership for a new terror proxy, Asa'ib Ahl al-Haq (AAH). *See Lee*, 518 F. Supp. 3d at 483. To facilitate AAH's rise, Iran's Supreme Leader met with a terrorist named Qais Khazali in Iran and asked him to lead it. *See Fritz*, 320 F. Supp. 3d at 62. Within several years, Khazali became the leader of all Special Groups in Iraq. *See id.* Khazali's recruitment was a coup for Iran because he was "familiar with Iranian surrogate networks operating in Iraq and their leadership structures and with the facilitation and movement of personnel and equipment across the Iran-Iraq border." *Id.* (cleaned up). Khazali frequently met with Quds Force officers to coordinate Iranian support. *See id.* And he "bragged of his group's role in 'forcing' the U.S. withdrawal from Iraq and killing American Soldiers." Pregent Rep. at 21.

But AAH's victories were not enough, for Iran continued to groom new terrorist groups to use as proxies. *See id.* at 10, 20. One of these groups, Kata'ib Hezbollah (KH), was led by a senior advisor to the IRGC. *See Karcher*, 396 F. Supp. 3d at 25. KH was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq." *Id.* Another group was

AQI.  *See* Pregent Rep. at 10, 20.  Iran provided AQI members with documents, identification cards, and passports to facilitate their movements.  *See id.* at 10.  And Iran even negotiated the release of AQI operatives from prison.  *See id.*  Similarly, Iran created the Badr Corps, which became its premier proxy in Iraq after the 2003 Iraq War.  *See* Hr'g Tr. at 21–22.  Members of the Badr Corps "dominated the officer ranks of the Iraqi Security Forces" and "Iraq's intelligence and security apparatus."  Pregent Rep. at 7; *see also* Hr'g Tr. at 22–23.

Iran also provided training and weapons to all of these proxies.  Indeed, by 2007 the IRGC and Quds Force provided about $750,000 to $3 million worth of assistance to its proxies every month.  *See Lee*, 518 F. Supp. 3d at 483.  Using Hezbollah and a variety of smuggling routes, Iran brought terrorists into the country for training.  *See id.*; *see also Karcher*, 396 F. Supp. 3d at 23.  At Iran's behest, Hezbollah "created a unit whose sole purpose was to train Iraqi Shia militants . . . to carry out attacks in Iraq directed at U.S. troops and others."  *Fritz*, 320 F. Supp. 3d at 63.  Hezbollah then ordered one of its senior commanders to travel to Iran to train the Special Groups "in ways that mirrored how Hezbollah was organized in Lebanon."  *Id.*  The commander traveled to Iran and met with Quds Forces operatives.  *Id.*  He ultimately made four trips into Iraq to "monitor and report on the training and arming of Special Groups[.]"  *Id.* at 64 (cleaned up).  "With Hezbollah's assistance, Iran provided training at every level of the militant organizations that received assistance, from foot soldier to leadership."  *Id.* (cleaned up).

In terms of weapons, Iran primarily provided explosively formed penetrators (EFPs), improvised explosive devices (IEDs), mortars, and rocket-propelled grenades (RPGs), plus training on how to use them.  *See* Pregent Rep. at 17–21; *see also* Hr'g Tr. at 27; *see also Fritz*, 320 F. Supp. 3d at 63.  EFPs are a signature weapon of Iran and have devasted American forces.  *See* Pregent Rep. at 18–19; *see also Karcher*, 396 F. Supp. 3d at 26, 27.  An EFP is a "short

metal pipe loaded with high-energy explosive and capped with a concave copper disk." *Karcher*, 396 F. Supp. 3d at 26.  Detonating the EFP forces the copper disk "outward into a molten slug" that travels fast enough to puncture "the hardest steel [the United States] can make" to armor its military vehicles.  *Id.*; *see also* Hr'g Tr. at 47–48 (explaining that EFPs are high-powered, directional explosives functioning as a "shotgun blast into [a] vehicle" that Iran's proxies could command-detonate).

Indeed, Iran introduced these "uniquely lethal" weapons because they could penetrate armored vehicles, unlike IEDs.  *Lee*, 518 F. Supp. 3d at 483; *see also* Pregent Rep. at 18.  EFPs require "precision craftsmanship" and "substantial technical expertise."  *Karcher*, 396 F. Supp. 3d at 26–27.  More, "[e]ffectively deploying the EFP call[s] for a further layer of technical know-how combined with substantial strategic planning."  *Id.* at 27.  The unique components of EFPs, the tactics through which they are deployed, and the expertise necessary to create them have led many experts to trace the EFPs detonated in Iraq to Iran and Hezbollah.  *See id.*; *see also* Hr'g Tr. at 27.

Beyond EFPs, Pregent explained that Iran also provided training on other weapons.  *See* Hr'g Tr. at 27, 151.  Iran's proxies needed to understand how to accurately deploy weapons such as IEDs and RPGs against Americans.  *See id.* at 50–52, 66–67.  And Iran taught them how to commit "complex attacks," which involve multiple weapons such as IEDs combined with RPGs, small-arms fire, and more.  *See id.* at 30–31, 66–67; *see also* Pregent Rep. at 6–7.

### C.    Iran's Role in Afghanistan

Through the Quds Force, Iran also provided lethal aid to the Taliban in Afghanistan in the form of both weapons and money.  *See* Pregent Rep. at 13–14.  Iran also became a transit point for moving fighters into Afghanistan, given its shared borders with the country.  *See id.* at 10.

Since at least 2006, the Quds Force has "arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and man-portable defense systems to the Taliban." *Id.* at 13. As the State Department has explained, "Iran has shipped a large number of weapons to Kandahar, Afghanistan, aiming to increase its influence in this key province."[3] And Iran invited Taliban members in for training on "ambushes, mortar and rocket attacks, IEF, EFPs, IEDs, sniper operations, and kidnapping operations." *Id.* at 15.

When Navy SEALs raided bin Laden's Pakistan compound in 2011, they found more evidence that Iran "facilitated the movement of operatives in Afghanistan" and "funded and armed al-Qaeda operatives to strike American targets." *Id.* at 12. Importantly, they learned that al-Zarqawi, the leader of AQI, received training and funds from the Quds Force. *See id.* In response, the United States sanctioned Hossein Musavi, commander of the Quds Force's Afghanistan unit known as the Ansar Corps.[4] Several years later, the Treasury Department designated al-Qaeda in Iran as a terrorist organization.[5] The designation "underscores that Iran continues to allow [al-Qaeda] to operate a core pipeline that moves [al-Qaeda] money and fighters through Iran to support [al-Qaeda] activities in South Asia." *Id.*

---

[3] *See Country Reports on Terrorism 2012* at 196, U.S. Dep't of State (Apr. 2008), https://2009-2017.state.gov/documents/organization/210204.pdf.

[4] *See Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership*, U.S. Dep't of the Treasury (Aug. 3, 2010), https://home.treasury.gov/news/press-releases/tg810.

[5] *See Treasury Further Exposes Iran-Based Al-Qa'ida Network*, U.S. Dep't of the Treasury (Oct. 18, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1741.aspx.

\*   \*   \*

Iran's support for terrorism has been far-reaching and effective.  Iran's provision of support to proxy groups allowed it to be the puppet master behind the curtain instigating what U.S. intelligence originally believed were unrelated terrorist attacks in Iraq and Afghanistan. *See, e.g.*, Hr'g Tr. at 6–7, 25–26.  Plaintiffs are victims of these attacks.

### D.    The Attacks

Plaintiffs' expert examined each attack to decide whether he could determine the likely perpetrators with a reasonable degree of professional confidence.  *See* Pregent Rep. at 22.  He described his methodology during the evidentiary hearing.  *See, e.g.*, Hr'g Tr. at 11–12.  For every attack, Pregent studied where it took place, the time, the weapons system used, the complexity of the attack, and what group had primacy in the relevant region.  *See id.* at 11, 14. He then compared that data with other "indicators" such as "foreign fighter flow" and any official military reports of "significant event[s] or significant activit[ies]" in the vicinity, called "SIGACTS."  *See id.* at 11, 15.[6]  Finally, he "overlay[ed] the IRGC-Quds Force strategy, al-Qaeda's strategy[,] and the U.S. military operations at the time in conjunction with Iraqi security forces."  *Id.* at 14.  Through these strategies, Pregent testified that he is able to conclude what terrorist group most likely committed each attack.  *See id.* at 14; *see also* Pregent Rep. at 22–37. Pregent used many of these same methods while he was working for the United States

---

[6]  Pregent explained that he found some of these SIGACT records and explosive reports in unredacted form on the WikiLeaks database, which he accessed because he no longer has a security clearance.  *See* Hr'g Tr. at 15.  Pregent is able to identify which WikiLeaks records are official State Department or Multinational Forces documents based on his experience looking at similar files while working in government.  *See id.*; *see also id.* at 17.  The Court is unaware of any other FSIA cases in which courts found WikiLeaks to be a credible source.  Without contrary evidence or arguments from Iran, the Court reluctantly accepts Pregent's analysis of purported government records he found in the database.

government in counterterrorism.  *See* Hr'g Tr. at 14.

Pregent also reviewed solider and family member declarations and each soldier's DD214 form—the official document detailing one's military history.  *See id.* at 15–16; *see also* Pregent Rep. at 22–37.  He used these documents to determine who was attacked and whether the nature and location of the attacks fit the profile of groups that received lethal aid from the Quds Force and Hezbollah.  *See* Pregent Rep. at 22–37.  And he compared the service members' declarations to the other data he amassed to test the accuracy of their recollections.  *See* Hr'g Tr. at 16–17.  Pregent's research led him to revise the specifics of some attacks.  *See id.* at 17–18.  In a few cases, Pregent's revisions led him to eliminate some attacks entirely.  *Compare, e.g.*, Pregent Rep. at 28 (explaining that Plaintiff BB was injured in an RPG attack in November 2006), *with* Compl. at 19 and Decl. of BB at ¶ 7, ECF No. 45-17 (claiming that BB was injured in an IED and vaporized chlorine attack in January or February 2007 along with the November 2006 RPG attack).  In other cases, Pregent merely changed the type of weapon that caused the attack.  For example, several soldiers said they were injured by EFPs, but Pregent determined that EFPs were not in use at the time of their injury.  *See, e.g.*, Hr'g Tr. at 74–75.  Where Pregent's expert conclusions diverged from Plaintiffs' affidavits, the Court relies on his report and testimony.

The Court now summarizes the various attacks at issue.  The Court begins with the attacks Pregent described as "complex" because of the multiple weapons involved, duration, and advanced planning required.  Then the Court discusses attacks involving EFPs, a signature weapon of Iran.  Finally, the Court discusses attacks involving IEDs, RPGs, and small arms fire.

### 1.    The "Complex" Attacks

*Attack #1*:  Plaintiffs A, B, C, D, E, F, G, H, I, J, K, L, and M are U.S. citizens who served in the Army National Guard during Attack #1.  *See* Decl. of A ¶ 1, ECF No. 45-10; Decl.

of B ¶ 1, ECF No. 45-30; Decl. of C ¶ 1, ECF No. 45-23; Decl. of D ¶ 1, ECF No. 45-28; Decl.

of E ¶ 1, ECF No. 45-21; Decl. of F ¶ 1, ECF No. 45-24; Decl. of G ¶ 1, ECF No. 45-32; Decl. of

H ¶ 1, ECF No. 45-11; Decl. of I ¶ 1, ECF No. 45-26; Decl. of J ¶ 1, ECF No. 45-1; Decl. of K

¶ 1, ECF No. 45-5; Decl. of L ¶ 1, ECF No. 45-6; First Am. Decl. of M ¶ 1, ECF No. 98.  This

attack also involves Plaintiffs N1 and N2, who are U.S. citizens and the surviving parents of N,

who was a U.S. citizen and serving in the Army National Guard when he was killed in the attack.

*See* Decl. of N1 ¶¶ 2–3, ECF No. 45-4.

Terrorists attacked in June 2004 when the soldiers were driving in a convoy in

Baqubah—where AQI had primacy—on a mission to clear IEDs.  *See, e.g.*, Hr'g Tr. at 73;

Pregent Rep. at 23.  As they neared a traffic circle, terrorists ambushed them in a complex attack

with "machine gun rounds, RPGs, and a daisy chain of IEDs."  Decl. of A ¶ 5; *see also* Hr'g Tr.

at 73–74.  Pregent explained that this attack "demonstrates a level of sophistication and [shows]

how prominent and how dangerous [AQI] was at the time."  Hr'g Tr. at 73.  He labeled it an

"ambush" because the particulars of the attack indicate that al-Qaeda had developed intelligence

and set up the attack on a road where they knew the soldiers were operating.  *See id.* at 74.  In

particular, the daisy-chained IEDs were "all tied together and spread out so they hit at different

points of the convoy," indicating thoughtful advanced planning.  *Id.* at 73.  Many Plaintiffs

suffered injuries from this attack, and one died as a result:

- N suffered a traumatic femoral artery injury.  He succumbed to his injuries.  *See* Decl.
  of N ¶ 8.

- A received shrapnel injuries to his hand and his neck, and a doctor diagnosed him
  with a traumatic brain injury (TBI), post-traumatic stress disorder (PTSD), and
  tinnitus.  *See* Decl. of A ¶¶ 6, 9.

- B suffered a TBI, shrapnel wounds, burns, a spinal cord injury, and vision loss. *See* Decl. of B ¶ 6.

- C received shrapnel wounds and gunshot wounds to his left arm. *See* Decl. of C ¶ 15. Medical providers later diagnosed him with PTSD. *See id.* ¶¶ 15, 16.

- D suffered shrapnel wounds, burns, and vision loss. *See* Decl. of D ¶¶ 7, 9, 10. He was later diagnosed with a spinal cord injury, hearing loss, tinnitus, fibromyalgia, and PTSD. *See id.* ¶ 7.

- E was diagnosed with a TBI, a spinal injury, tinnitus, and PTSD. *See* Decl. of E ¶ 8.

- F was severely burned and took many shrapnel wounds to his back and body. *See* Decl. of F ¶ 6. He suffered vision loss, and doctors later diagnosed him with PTSD, a back injury, tinnitus, and injuries to his knees, ankles, and both his shoulders. *See id.* ¶ 7.

- G was knocked unconscious by the attack and doctors later diagnosed him with TBIs, a detached retina in his left eye, and PTSD. *See* Decl. of G ¶¶ 6, 8.

- H was injured by direct and secondary blasts and sustained blast injuries, TBIs, hearing loss, an ankle injury, and was later diagnosed with PTSD. *See* Decl. of H ¶ 9.

- I was hit in the knee by a turret shield door and received shrapnel wounds to his left hand. Doctors later diagnosed him with hearing loss and PTSD. *See* Decl. of I ¶¶ 7, 11.

- J was hit by direct and secondary blasts and suffered a TBI, a blast injury, and vision loss. *See* Decl. of J ¶ 7. A doctor later diagnosed him with PTSD. *See id.*

- K suffered a TBI, a back injury, and hearing loss. *See* Decl. of K ¶ 6. Medical professionals later diagnosed him with PTSD. *See id.*

- L suffered a TBI, vision loss, and was later diagnosed with PTSD.  *See* Decl. of L ¶ 6.

- M suffered a concussion, TBIs, and injuries to his back and both legs.  Decl. of M

  ¶ 33.  He continues to experience sleep apnea, PTSD, Hashimoto's thyroiditis,

  urinary hesitancy, hypogonadism, and erectile dysfunction.  *Id.*

The soldiers who suffered TBIs and who were diagnosed with PTSD explained how these conditions continue to undermine their daily existence.  *See, e.g.*, Decl. of E ¶¶ 9, 10; Decl. of K ¶¶ 9, 10.

Pregent attributed this attack to AQI, to whom the Quds force and Hezbollah "provided lethal aid," "foreign fighters," and training.  Pregent Rep. at 23; Hr'g Tr. at 73–77.  Pregent explained that this complex, sophisticated attack took place in an area where AQI had primacy. *See* Hr'g Tr. at 73.  More, this was the type of attack that AQI was known for because it used different, strategically placed weapons.  *See id.* at 76.  Therefore, based on the time, types of weapons, sophistication of the attack, and the group controlling the region, Pregent concluded that only AQI could have been responsible.  *See id.* at 74–76.

*Attack #3*: Plaintiff O is a U.S. citizen who served in the U.S. Army.  *See* First Am. Decl. of O ¶ 1, ECF No. 92.  While serving in Iraq, he was a member of a team working to breach a building to secure a target in October 2008.  *See id.* ¶¶ 5–6.  During the mission, the building door exploded, knocking O unconscious.  *See id.* ¶ 6.  When he regained consciousness, he was under fire from terrorists armed with RPGs and small arms.  *See id.*  O suffered blast injuries, shrapnel wounds, fractures to both of his feet, and a back injury.  *See id.* ¶ 7.  Doctors later diagnosed him with PTSD, a TBI, hearing loss, and knee bursitis.  *See id.* ¶ 8.

Pregent attributed the attack to AAH because of its location and his knowledge that the Quds force had trained AAH on the weaponry and tactics used.  *See* Pregent Rep. at 23–24; *see*

15

*also* Hr'g Tr. at 123–24.  Pregent classified this as a "complex" attack because it involved multiple weapons systems and was sustained over time.  *See id.* at 122–23.  And Pregent explained that at this point in time (October 2008), U.S. forces were attempting to take down Shia Special Groups in Baghdad.  *See id.* at 122.  Indeed, nearly all of the military SIGACTs in and around the area of the attack involved Shia Special Groups.  *See id.* at 123.

*Attacks #15 and 16*:  Plaintiff P is a U.S. citizen who served in the U.S. Army.  *See* Decl. of P ¶ 1, ECF No. 45-19.  He was driving an Army truck near Mosul in November 2006 when a roadside bomb exploded.  *See id.* ¶ 6.  P's body armor ended up covered in blood from injuries to the truck's gunner.  *See id.* ¶¶ 5–6.  Seven months later, P was near the same location when an RPG and small arms fire hit his vehicle.  *See id.* ¶ 8.  Because of injuries he sustained in these attacks, P suffers from hearing loss and PTSD.  *See id.* ¶ 12.

Pregent concluded that AQI was responsible for these attacks.  *See* Pregent Rep. at 29. He explained that the U.S. military was actively battling AQI in this area, and that it was the main weapons supply and foreign fighter route into Iraq.  *See* Hr'g Tr. at 101.  Indeed, Pregent reported that U.S. forces found nearby weapons caches containing mortars and rockets with Iranian serial numbers.  *See id.* at 101–02.  He also noted that the roadside bomb in the first attack "ha[d] a mortar component, meaning an indirect fire component."  *Id.* at 100.  And he explained that the second attack involved sustained fighting with multiple weapons systems.  *See id.* at 100–01; *see also* Pregent Rep. at 29–30.  So Pregent labeled both complex attacks, and found that they were similar to other SIGACTs in the region attributable to AQI.  *See* Hr'g Tr. at 100–01.  And he testified that only AQI could have carried out these types of attacks at the time. *See id.* at 104–05.

16

## 2.    The EFP Attacks

*Attack #2*:  Plaintiff Q is a U.S. citizen who formerly served in the U.S. Army.  *See* Decl. of Q ¶ 1, ECF No. 45-2.  In October 2006, Q was traveling in a vehicle in Baghdad when an EFP hit it.  *See id.* ¶ 5.  He sustained a TBI and hearing loss.  *See id.* ¶¶ 5, 7.  A doctor later diagnosed Q with PTSD.  *See id.* ¶ 7.  Pregent attributed the EFP attack to AAH—whom the Quds force trained and funded—based on the signature weapon used and the area where the attack occurred. *See* Pregent Rep. at 23.

*Attack #4*:  Plaintiff R1 is a U.S. citizen and the surviving spouse of R, who served in the U.S. Army.  *See* Decl. of R1 ¶¶ 1, 4, ECF No. 45-7.  R was the gunner for an armored vehicle that was struck by multiple EFPs in Baghdad in November 2006.  *See id.* ¶ 6.  Fellow soldiers evacuated R from the scene, but he was later pronounced dead.  *See id.* ¶ 7.  Based on the signature weapon used in the attack and the location, Pregent found that AAH was responsible. *See* Pregent Rep. at 24.

*Attack #11*:  Plaintiffs S, T, U, and V are U.S. citizens who served in the U.S. Army.  *See* First Am. Decl. of S ¶ 1, ECF No. 91-2; Decl. of T ¶ 1; ECF No. 45-15; Decl. of U ¶ 1, ECF No. 45-27; Decl. of V ¶ 1, ECF No. 45-29.  The soldiers were traveling in a convoy of armored vehicles through Mosul in February 2007, when the rear vehicle containing S was struck by an EFP.  *See* Decl. of S ¶ 5.  The other three vehicles stopped, and then the first vehicle was struck by an IED.  *See id.*  The convoy was pinned down and the soldiers engaged in a fifteen-minute firefight before they repelled the terrorists.  *See id.*

Doctors diagnosed S with multiple TBIs, and he suffers from tinnitus and PTSD.  *See id.* ¶ 10.  T was diagnosed with multiple TBIs and is plagued by ringing in his ears, chronic pain in his right hip, headaches, and PTSD.  *See* Decl. of T ¶¶ 10, 11.  U suffers from multiple TBIs,

back and neck injuries, tinnitus, and PTSD. *See* Decl. of U ¶ 10. V was diagnosed with, and continues to suffer from, multiple TBIs, right upper extremity radiculopathy, neck pain, right knee pain, tinnitus, and PTSD. *See* Decl. of V ¶ 10.

Pregent attributed this EFP and secondary IED and small arms fire attack to Quds-trained and funded Shia Special Groups based on the signature weapons, tactics used, and the primacy of the special groups in the region of the attack. *See* Pregent Rep. at 27.

*Attack #17*: Plaintiff W is a U.S. citizen who served in the U.S. Army. *See* Decl. of W ¶ 1, ECF No. 45-20. Between November 2006 and January 2007, W escorted explosive disposal personnel to known IED, EFP, and roadside bomb locations near Mosul so they could be defused or safely detonated. *See id.* ¶ 5. While performing this duty, he was exposed to, and suffered blast injuries from, the detonation of the IEDs, EFPs, and other roadside bombs. *See id.* Doctors later diagnosed him with PTSD, tinnitus, and hearing loss. *Id.* ¶ 6. Pregent attributed the EFP blasts to AAH because EFPs were the group's signature weapons, and he attributed the IED attacks to Iran's proxies and Hezbollah based on the location of the explosions. *See* Pregent Rep. at 30.

*Attack #18*: Plaintiff X is a U.S. citizen who served in the U.S. Army. *See* Decl. of X ¶ 1, ECF No. 45-25. In February 2011, X was driving an enhanced armament carrier in a vehicle convoy on a supply route south of Baghdad when his vehicle was struck by an EFP. *See id.* ¶¶ 5, 6. X's vehicle rolled and flipped over. *See id.* ¶ 7. X sustained a TBI and injuries to his back and right ankle and suffers from tinnitus and PTSD. *See id.* ¶¶ 8, 9. Pregent attributed this attack to AAH based on the signature weapon used and the fact that it occurred in an AAH stronghold. *See* Pregent Rep. at 31.

### 3.    The IED, RPG, and Small Arms Attacks

*Attacks #5 and 6*:  Plaintiff Y is a U.S. citizen who formerly served in the U.S. Army.

*See* Decl. of Y ¶ 1, ECF No. 45-9.  Y was a gunner in an armored vehicle traveling through Sadr

City in May 2009.  *See id.* ¶ 7.  The vehicle hit an IED and the blast threw him from the vehicle.

*See id.*  He did not wake up until he was in a medical tent back at a military base.  *See id.*  He

sustained blast injuries and a TBI from that attack.  *See id.*

About two years later, Y and his unit responded to an explosion at a car dealership in

Baghdad.  *See id.* ¶ 8.  As he was securing the area, several IEDs exploded, blowing him off his

feet.  *See id.*  He also sustained blast injuries and a TBI from this attack.  *See id.*  Medical

professionals later diagnosed him with PTSD, anxiety, depression, and night terrors.  *See id.* ¶¶

10, 11.

Pregent found that Shia Special Groups AAH and KH perpetrated these attacks based on

the weaponry and locations.  *See* Pregent Rep. at 24.  Pregent explained that Sadr City is a

"militia-controlled area" because "military-aged males . . . are the ones that are recruited directly

into [Shia] militias."  Hr'g Tr. at 124.  As for the second attack, it occurred while U.S. forces

were on their way out of Iraq, a time when the Shia Special Groups funded and trained by Iran

had adopted tactics to "make [Americans] bleed on the way out."  *See id.* at 124–25.  And

Pregent explained that the Quds Force trained AAH and KH militia members to use IEDs.  *See*

*id.* at 125.

*Attack #7*:  Plaintiff H—also injured in Attack #1—was injured in December 2004 in the

Diyala Province of Iraq.  *See* Decl. of H ¶ 8.  H was the driver of an armored vehicle in a convoy

returning to a military base.  *See id.*  He swerved to avoid hitting something in the road, and an

IED exploded.  *See id.*  H was injured by direct and secondary blasts, which contributed to his

TBIs, hearing loss, ankle injury, and PTSD.  *See id.* ¶ 9.  Pregent attributed this attack to AQI.

*See* Pregent Rep. at 25.  Based on his analysis, Pregent determined that the Quds Force

contributed to this attack through its support of Sunni and Shia militias.  *See id.*  The attack

occurred in an area where AQI was the dominant group, if not the only group, operating.  *See*

Hr'g Tr. at 81.  And AQI frequently used IEDs in this area based on SIGACT reports.  *See id.*

Indeed, Pregent described the IED as AQI's "preferred tactic."  *Id.*

　　*Attacks #8 and 9*:  Plaintiff Z is a U.S. citizen who served in the U.S. Army.  *See* First

Am. Decl. of Z ¶ 1, ECF No. 101.  In June 2004, while on a mission near Samara, Iraq, to reduce

the size of berms that insurgents had been using to bury IEDs, Z's unit came under attack.  *See*

*id.* ¶ 5.  A bullet ricocheted off his gun, and fragments from the gun and the bullet hit his face.

*See id.*  The bullet and fragments lacerated Z's upper lip and the soft tissue under his nose, broke

seven of his teeth, chipped other teeth, shredded his tongue, and then lodged in the back of his

throat.  *See id.*  Nonetheless, Z continued to fight for 30 minutes before he was taken to a field

hospital.  *See id.*  He lost consciousness while doctors were treating him at that hospital, and he

did not wake up until he was at a military hospital in Germany.  *See id.*  He spent a month in the

intensive care unit, and his wounds required multiple facial and dental surgeries.  *See id.*  Even

after discharge from the hospital, he required several more surgeries as well as speech therapy

and further dental work.  *See id.*

　　Remarkably, Z redeployed to Iraq mere months later.  *See id.* ¶¶ 5, 6.  While he was

patrolling to inspect polling sites in Samara before the Iraqi national election in January 2005,

two armor-piercing RPGs hit his vehicle.  *See id.* ¶ 6.  Z sustained an open compressed skull

fracture with a brain hematoma, a TBI, an injury to his left leg that led to amputation, a deep

joint and soft tissue injury to his right knee, an open fracture of his right hand and ring finger, a

detrusor instability, a thoracolumbar sprain with marked single level degenerative joint disease of the lumbar spine, a left elbow fracture, right shoulder degenerative joint disease, and many other shrapnel wounds and burns to his body.  *See id.*  He lost consciousness after the RPG struck and did not wake up for some time.  *See id.*  After the attacks, doctors diagnosed Z with PTSD, TBIs, sleep apnea, night terrors, tinnitus, hearing loss, and vision problems.  *See id.* ¶ 7.

Pregent concluded that AQI committed both attacks.  *See* Pregent Rep. at 25–26.  Both took place in areas where the Quds Force provided lethal aid to AQI to target Americans, and where AQI maintained a "stronghold."  *See id.*; *see also* Hr'g Tr. at 64.  Pregent noted that AQI felt free to operate in this area, and U.S. intelligence had reports of high-value targets, weapons caches, and safe houses for AQI.  *See* Hr'g Tr. at 65.  And Pregent explained that the attack was a "sustained 30-minute ambush where the two-man cell is using effective fires, meaning they're accurate."  Hr'g Tr. at 65.  More, the terrorists displayed tactics "where one man moves and the other man lays down suppressive fire," which reveal a level of training.  *See id.*  As for the RPGs used in the second attack, Pregent explained that these are "highly sought-after weapons system[s]."  *Id.* at 66.  And if the RPG attacks were accurate, that "denotes proficiency" and indicates that the terrorist was "trained on it."  *Id.*  Pregent also submitted SIGACT entries corroborating some facts about these two attacks.  *See* Exs. 120, 121, ECF Nos. 100-7, 100-8.

*Attack #10*:  Plaintiff AA is a U.S. citizen who formerly served in the U.S. Army National Guard.  *See* Decl. of AA ¶ 1, ECF No. 45-14.  In July 2004, AA was conducting a route-clearing mission in Baqubah, Iraq, when his vehicle was struck by an IED.  *See* Pregent Rep. at 26.  AA suffered vision loss and a TBI in the attack, and doctors later diagnosed him with PTSD.  *Id.* ¶ 6.  Pregent attributed this attack to AQI based on the weaponry and the fact that AQI had primacy in the region.  *See* Pregent Rep. at 26–27; *see also* Hr'g Tr. at 77–79.  He explained the degree of

training and knowledge necessary to deploy IEDs accurately, and he noted that AQI consistently used IEDs in this area based on the SIGACTs he reviewed.  *See* Hr'g Tr. at 79–80.

*Attack #12*:  Plaintiffs T, S, U, and V—injured in Attack #11—were again injured in May 2007 by an IED outside of Tal Afar.  *See* Decl. of T ¶ 7; Decl. of S ¶ 7; Decl. of U ¶ 7; Decl. of V ¶ 7.  This attack exacerbated the injuries these soldiers previously incurred.  *See, e.g.*, Decl. of T ¶¶ 10, 12.  Pregent attributed this attack to AQI based on the weaponry and the location.  *See* Pregent Rep. at 27.  Pregent testified that AQI was dominant in the area where the attack occurred and that the IED was AQI's most effective weapon.  *See* Hr'g Tr. at 111.  Pregent explained that when this attack occurred, the U.S. military's biggest concern was stopping foreign fighters from entering Iraq from Syria, which the Quds Force and Hezbollah facilitated.  *See id.* at 112.  But Pregent did not identify a SIGACT entry for this particular attack.  He explained that sometimes it is tough to find a SIGACT because of lack of documentation or a soldier's lack of specificity about when an attack occurred.  *See id.* at 97–98.  So Pregent analyzed all of the SIGACT reports of attacks in that area around the same time to study what groups were responsible.  *See id.*  And Pregent found that many SIGACT entries in this area involved AQI attacking with IEDs, which further supported his attribution.  *See id.* at 112–13.

*Attack #13*:  Plaintiff BB is a U.S. citizen who served in the U.S. Army.  *See* Decl. of BB ¶ 1.  He was driving a military vehicle near Baqubah in November 2006 when two RPGs struck it.  *See id.* ¶ 5.  He was diagnosed with, and continues to suffer from, TBIs, pulmonary problems, PTSD, sleep apnea, and tinnitus.  *See id.* ¶ 9.  Pregent attributed this attack to AQI based on the weaponry and the area.  *See* Pregent Rep. at 28.  Pregent explained that Baqubah had strategic value to Iran at the time.  *See* Hr'g Tr. at 92.  Iran wanted AQI "to be the dominant force" there while AQI worked to infiltrate the Iraqi security forces and government.  *See id.* at 92–93.

Pregent did not submit a SIGACT entry for this attack. But following the same methodology as for Attack #12, he found other SIGACT entries for AQI-led RPG attacks in this area, which bolstered his attribution. *See id.* at 94–95; *see also id.* at 99.[7]

*Attack #14*: Plaintiff M—also injured in Attack #1—was targeted by terrorists a second time in September 2004. He was part of a team conducting route reconnaissance to clear a main supply route. *See* Decl. of M ¶ 19. The driver of M's vehicle thought he saw an IED and tried to maneuver around it, but in the process he triggered another IED. *See id.* ¶¶ 23–24. M suffered a concussion, TBIs, and injuries to both legs and his back. *See id.* ¶ 33. He continues to deal with sleep apnea, PTSD, Hashimoto's thyroiditis, urinary hesitancy, hypogonadism, and erectile dysfunction. *See id.* Pregent attributed this attack to AQI based on the location and the weaponry involved. *See* Pregent Rep. at 28–29; *see also* Hr'g Tr. at 80. He also explained that M's particular unit focused on destroying AQI's IED cells because this was AQI's most effective tactic in the region to injure American troops. *See* Hr'g Tr. at 80.

*Attacks #19 and 20*: Plaintiff CC is a U.S. citizen who served in the U.S. Army. *See* Suppl. Decl. of CC ¶ 1, ECF No. 98-1. In June 2003, CC was driving an armored vehicle near Kirkuk working to disrupt Iran's lethal aid supply routes into Iraq. *See* Suppl. Expert Rep. of Michael Pregent (Pregent Suppl. Rep.) at 1–2, ECF No. 97-1. Suddenly, the vehicle in front of him triggered an IED. *See* Suppl. Decl. of CC ¶ 5. CC suffered blast injuries and a TBI from that attack. *See id.* ¶ 5. About two months later, CC was driving along the same route working to uncover Iranian weapons caches when his vehicle struck another IED. *See id.* ¶ 6; *see also*

---

[7] BB also claimed he was injured in another attack in January or February 2007 involving a chlorine bomb. *See* Decl. of BB ¶ 7; Compl. ¶ 380. But because Pregent determined that attack did not happen, the Court finds no liability for it. *See* Hr'g Tr. at 18; Pregent Rep. at 28.

Pregent Suppl. Rep. at 2.  CC suffered more blast injuries and another TBI.  *Id.*  Doctors also diagnosed him with hearing loss, tinnitus, and PTSD.  *See id.* ¶ 7.

Pregent attributed these attacks to AQI based on the weaponry and location.  *See* Pregent Rep. at 31; Pregent Suppl. Rep. at 2–4.  Pregent testified that the attacks involving CC occurred when Iran was providing foreign fighters and filling weapons caches to aid AQI.  *See* Hr'g Tr. at 46.  More, the attacks occurred in an area where AQI had control.  *See id.*  And he explained that the IED was an "advanced technique" that Iran trained AQI to emplace and trigger.  *See id.* at 49–50.

*Attack #21*:  Plaintiff DD is a U.S. citizen who served in the U.S. Army.  *See* Decl. of DD ¶ 1, ECF No. 45-33.  In June 2004, he was traveling in a convoy near the Abu-Ghraib District of Iraq, when an IED exploded nearby.  *See id.* ¶ 6.  Shrapnel imbedded into his left hand, and DD incurred a severe concussion and a TBI.  *See id.*  Doctors also diagnosed him with PTSD and bipolar disorder.  *See id.* ¶ 7.  Pregent concluded that AQI was responsible for this attack.  *See* Pregent Rep. at 33.  He explained that the attack occurred in an area west of Baghdad where "all the foreign fighters were flowing . . . through this corridor from the Syrian border."  Hr'g Tr. at 60.  The increase in foreign fighters and weapons caches in the area helped make AQI more lethal.  *See id.* at 59–61.  And Pregent again explained how Iran trained AQI on how to place IEDs.  *See id.* at 62.

*Attack #22*:  Plaintiff EE is a U.S. citizen who served in the U.S. Marine Corps.  *See* Decl. of EE ¶ 1, ECF No. 45-34.  He was leading a three-vehicle security patrol in Anbar Province, Iraq, in February 2007 when terrorists targeted his vehicle with an RPG.  *Id.* ¶¶ 5, 8–10.  Shrapnel hit him in his left cheek and wrist, causing lacerations.  *See id.* ¶¶ 10–11.  Because of the attacks, EE was diagnosed with—and still suffers from—PTSD and temporomandibular

joint disorder.  *See id.* ¶ 18.  Pregent attributes this attack to AQI based on its primacy in the region and the weapons system.  *See* Pregent Rep. at 33–34; *see also* Hr'g Tr. at 109.  Pregent testified that Anbar was the most dangerous province in Iraq at the time because it was an AQI safe haven.  *See* Hr'g Tr. at 109–10.  He also explained that he reviewed many SIGACTs in this area where AQI perpetrated similar attacks.  *See id.* at 110.  And he submits a SIGACT for this particular attack that corroborates some of EE's allegations.  *See* Ex. 122, ECF No. 100-9.

*Attack #23*:  Plaintiff FF is a U.S. citizen who served in the U.S. Marine Corps.  *See* Decl. of FF ¶ 1, ECF No. 45.  In March 2011, he was participating in a mission to clear a hill of IEDs in Kajaki District, Afghanistan, when the Marine in front of him stepped on a pressure plate, triggering an IED.  *See id.* ¶¶ 7–12.  As FF rushed to the other Marine's aid, he stepped on another pressure plate, triggering an IED explosion that led to the amputation of his legs.  *See id.* ¶ 13.  Medical professionals later diagnosed FF with a TBI, back pain, tinnitus, hearing loss, and PTSD.  *See id.* ¶ 17.  Pregent concluded that that the Taliban—whom Iran trained and equipped with lethal aid—committed this attack.  *See* Pregent Rep. at 36.  Pregent noted that the "Taliban operates with impunity" in the area where the attack occurred.  Hr'g Tr. at 140.  He explained that his attribution rested on the location of the attack and the weapon used, an IED.  *See id.* at 141.

*Attack #24*:  Plaintiff Y—who was also injured in Attacks #5 and 6—was injured in July 2013 near Puli Alam, Afghanistan.  *See* Decl. of Y ¶ 9.  He was attacked by individuals armed with rockets.  *See id.*  The blast from the rockets knocked Y off his feet and killed two of his comrades.  *See id.*  He suffered blast injuries and a TBI, which contributed to his PTSD, anxiety, and night terrors.  *See id.* ¶ 10.  Pregent attributed this attack to Taliban fighters trained and supplied by the Quds Force based on the location and the type of weapon.  *See* Pregent Rep. at

36.  Present noted that the Quds force "specifically trained the Taliban fighters on [rocket attacks] to use against American forces."  Hr'g Tr. at 145.  And training was necessary to ensure that the rocket injured its target.  *See id.*  More, Present explained that the Taliban was operating freely in the area of the attack.  *See id.*

*Attack #25*:  Plaintiff GG is a U.S. citizen who served in the U.S. Army.  *See* Decl. of GG ¶ 1, ECF No. 45-13.  During a yearlong deployment from 2007 to 2008, he worked within the Kunar and Nuristan Provinces to secure the terrain, train Afghan locals in military and defense tactics, and provide security to Afghan locals and contractors repairing roads.  *See id.* ¶ 6.  During his yearlong deployment, various individuals armed with RPGs, rockets, mortars, and small arms attacked him.  *See id.*  Doctors later diagnosed him with PTSD, hearing loss, tinnitus, and injuries to his back from cumulative trauma—though not from any particular attack.  *Id.* ¶ 8.  Present attributed these attacks to Taliban fighters trained and supplied by the Quds Force based on their primacy in the area.  *See* Present Rep. at 36

*Attack #26*:  GG was back in Afghanistan in November 2012, this time serving in Kandahar.  *See* Decl. of GG ¶ 7.  His unit was charged with clearing a dry riverbed when an IED struck his vehicle.  *See id.*  GG was standing in the gun turret and sustained a TBI from the attack.  *See id.*  This attack also contributed to his PTSD, hearing loss, tinnitus, and back injuries. *See id.* ¶¶ 8, 10.  Present concluded that the Taliban committed this attack based on the weaponry and its location.  *See* Present Rep. at 37.  Present explained that this attack occurred at a time when the Taliban was regaining territory in Afghanistan and in an area where they operated with impunity.  *See* Hr'g Tr. at 144.  And, as Present noted elsewhere, the IED used was a sophisticated weapons system that required training to use.  *See, e.g.*, *id.* at 50–51, 76, 151.

### III.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 55(b)(2), the Court may enter default judgment when a party applies for it.  But the entry of a default judgment "is not automatic."  *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  The Court has an "affirmative obligation" to determine whether it has subject matter jurisdiction over the matter.  *Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  A court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant," but "[i]n the absence of an evidentiary hearing, although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing."  *Mwani*, 417 F.3d at 6–7 (cleaned up).

Special procedures govern entry of default when the defendant is a sovereign state. Federal district courts "have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity" under the FSIA.  28 U.S.C. § 1330(a).  "The Foreign Sovereign Immunities Act . . . affords the sole basis for obtaining jurisdiction over a foreign state in United States courts."  *Mohammadi*, 782 F.3d at 13.  "While the FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . .  that grant of immunity is subject to a number of exceptions."  *Id.* at 13–14.

The exception relevant here is the so-called terrorism exception found in 28 U.S.C. § 1605A.  Section 1605A confers subject matter jurisdiction, recognizes a federal cause of action against foreign states subject to the exception, and addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state.  *See* 28 U.S.C. § 1608.

Different standards of proof govern the Court's personal jurisdiction and subject matter jurisdiction inquiries.  Plaintiffs need only make a "prima facie showing" of personal jurisdiction.  *Mwani*, 417 F.3d at 6–7.  But for the Court to exercise subject matter jurisdiction,

Plaintiffs need to "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  The statute does not specify what constitutes "evidence satisfactory to the court," and the D.C. Circuit has left it to courts to determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Repub. of Korea*, 774 F.3d 1044, 1046–51 (D.C. Cir. 2014).  "[C]ourts have the authority—indeed . . . the obligation— to adjust evidentiary requirements to . . . differing situations."  *Id.* at 1048 (cleaned up).  The evidence must consist of "admissible testimony in accordance with the Federal Rules of Evidence," *id.* at 1049 (cleaned up), and it must be sufficient for the court to come to the "logical conclusion" that the defendant is responsible for the plaintiffs' injuries, *id.* at 1051.

## IV.   ANALYSIS

First, the Court will determine whether it has subject matter jurisdiction.  This analysis considers whether Plaintiffs have carried their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA.  Second, the Court considers whether it has personal jurisdiction over Iran.  Third, the Court evaluates whether Plaintiffs have pled a federal cause of action and proven a theory or theories of liability.

### A.   Subject Matter Jurisdiction

"FSIA begins with a presumption of immunity" under 28 U.S.C. § 1330(a).  *Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  So to establish subject matter jurisdiction, Plaintiffs bear "the initial burden to overcome [that presumption] by producing evidence that an exception applies."  *Id.*  Once Plaintiffs make this showing, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply."  *Id.*

To invoke the terrorism exception to sovereign immunity in 28 U.S.C. § 1605A, Plaintiffs must make two threshold showings. *First*, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor when the act of terrorism occurred. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs here easily meet this requirement because all are U.S. citizens. *See* Compl. ¶¶ 67–384.

*Second*, the State Department must have designated the foreign government as a state sponsor of terrorism at the time of the attack and when Plaintiffs filed their lawsuit. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs meet this requirement because the U.S. State Department has designated Iran as a State Sponsor of Terrorism since 1984. Compl. ¶ 2.[8]

Plaintiffs who overcome these threshold showings must then show that their claims fit within the narrow waiver of sovereign immunity in 28 U.S.C. § 1605A(a)(1). That waiver contains five requirements:

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The Complaint establishes the first two requirements: Plaintiffs seek money damages, *see* Compl. ¶ 389, for the injuries to themselves or their family members, *see id.* ¶ 385–93. The Court's analysis thus focuses on the latter three requirements, although in a different order.

---

[8] *See also State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last accessed December 5, 2022).

### 1.   Iran Provided "Material Support" to Terrorist Groups

Recall the resources that Iran provided to its proxies.  Plaintiffs and their expert have

sufficiently alleged that senior officials in Iran and its Quds Force supported Hezbollah; Shia

Special Groups, including AAH and KH; the Taliban; and al-Qaeda.  *See supra* II.A–C.  Iran

provided these groups with training, weapons, soldiers, safe haven and smooth passage, and

more.  *See id.*  More, Pregent described various high-level meetings between the leaders of these

terrorist groups and Iranian military officials.  *See id.*  Plaintiffs have thus provided ample

evidence "satisfactory to the court," 28 U.S.C. § 1608(e), that Iran materially supported the

terrorist groups and that this support came from an "agent of such foreign state while acting

within the scope of his or her office, employment, or agency," *id.* § 1605A(a)(1).

### 2.   Iran Provided Material Support "For" Extrajudicial Killings

Another requirement of the sovereign immunity waiver is that the nation provide material

support for extrajudicial killings.  *See* 28 U.S.C. § 1605A(a)(1).  "Extrajudicial killing" has the

same meaning as in Section 3 of the Torture Victim Protection Act (TVPA) of 1991.  *See* 28

U.S.C. § 1605A(h)(7).  The TVPA defines an extrajudicial killing as "a deliberated killing not

authorized by a previous judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C.

§ 1350 note.  "[T]his definition contains three elements:  (1) a killing; (2) that is deliberated; and

(3) is not authorized by a previous judgment pronounced by a regularly constituted court."

*Owens*, 864 F.3d at 770.

Start with the first element, "a killing."  Plaintiffs admit that only some attacks were fatal.

*See* Pls.' Mem. at 24.  They argue their claims qualify anyway because courts in this district have

found that the term "extrajudicial killing" encompasses "'deliberated' attempts to kill."  *Id.*

(quoting *Karcher*, 396 F. Supp. 3d at 58).  But the word "killing" implies to any speaker of English that an action ended someone's life.  *See Killing*, Black's Law Dictionary (11th ed. 2019) ("The act of causing the end of an animate thing's life.").  Other courts agree.  In *Owens*, the D.C. Circuit found that bombings of American embassies constituted killings because they "caused the death of more than 200 people in Kenya and Tanzania."  864 F.3d at 770.  The Eleventh Circuit likewise reads the TVPA to require, "at a minimum," some act "that takes another's life."  *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1233 (11th Cir. 2020).  Thus, an attack cannot be a "killing," much less an extrajudicial one, if nobody dies.

That said, the FSIA waives sovereign immunity for injuries caused by "material support *for*" an extrajudicial killing if an official of the foreign state acting within the scope of his office provided that support.  28 U.S.C. § 1605A(a)(1) (emphasis added).  "The word 'for' matters."  *Borochov v. Islamic Repub. of Iran*, 589 F. Supp. 3d 15, 32 (D.D.C. 2022).  As this Court explained in *Borochov*, the word "for" in § 1605A(a)(1) "indicate[s] the object or purpose of an action or activity."  *Id.* (quoting Am. Heritage Dictionary 329 (3d ed. 1994)).  Thus, a foreign state's support with the object or purpose of an extrajudicial killing constitutes support "for such an act" under the statute.  *Id.*; *accord Force v. Islamic Repub. of Iran*, 464 F. Supp. 3d 323, 360– 61 (D.D.C. 2020).  And support with that intention or objective can therefore cause an injury, even if an attack carried out with that support does not cause a killing.  *See Borochov*, 589 F. Supp. 3d at 32.  This interpretation faithfully considers Congress's inclusion of "for" in the statute and abides by the D.C. Circuit's guidance to "interpret [the FSIA's] ambiguities flexibly and capaciously."  *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013).

Plaintiffs have thoroughly alleged that Iran provided material support to proxy groups in Iraq and Afghanistan to cause killings.  *See supra* II.A–C.  Pregent explained that Iran trained

various proxy groups for years before unleashing them on U.S. forces.  *See, e.g.*, Pregent Rep. at 6–15; *see also* Hr'g Tr. at 26–28.  For example, Iran trained al-Zarqawi, who eventually founded AQI with the mission of killing Americans in Iraq.  *See* Hr'g Tr. at 26–27.  During these trainings, Iran taught particular tactics designed to cause great harm, such as ambushes, mortars, rockets, and IED emplacement.  *See, e.g.*, Pregent Rep. at 15; Hr'g Tr. at 27–28.  And after unleashing al-Zarqawi, Iran released Sunni jihadists from prison and sent them into Iraq to kill Americans.  *See id.* at 26.  Pregent—who was in Iraq around the same time—explained the shift in enemy capabilities.  He testified that U.S. forces

> started seeing this capable combatant come into Iraq . . . [who] had received training.  This wasn't the ISIS wave where you simply had volunteers wanting to martyr themselves and kill an American.  These were individuals that learned how to . . . build an IED, that were snipers, that knew how to build a car bomb, that knew how to conduct a terrorist cell.  They had accurate fires when it came to mortars [and] rockets.

*Id.* at 35–36 (cleaned up).

On top of training and troops, Iran provided weapons to its proxies.  *See, e.g.*, Pregent Rep. at 13.  Iran used specific smuggling routes to get these weapons into Iraq and Afghanistan, and several attacks targeting Plaintiffs occurred along these routes.  *See* Hr'g Tr. at 37–38.  These weapons included small arms, ammunition, RPGs, IEDs, mortars, and more.  *See, e.g.*, Pregent Rep. at 13.  When the U.S. military increased the armor surrounding its vehicles to counter IEDs, Iran innovated.  *See* Hr'g Tr. at 47–48.  Iran introduced the extremely lethal EFP, which could puncture the strongest armor America could make for its vehicles.  *See id.* at 48.  Iran gave these EFPs to its proxies and trained them on emplacement to ensure maximum U.S. casualties.  *See id.*

In short, Iran's proxies launched the attacks in which Plaintiffs were injured with intent to kill and with material support—including training, soldiers, and weapons—from Iran.  None of

the attacks injuring Plaintiffs were sanctioned by applicable law.  *See* 28 U.S.C. 1350 note.

Thus, Iran gave material support for an extrajudicial killing.

### 3.     Causation

Plaintiffs must show that the attacks were "caused by" Iran's material support to terrorist

groups.  *Mark v. Islamic Repub. of Iran*, No. 20-cv-00651, 2022 WL 4103854, at *6 (D.D.C.

Sept. 8, 2022).  But they need not establish a close nexus between Iran's support and the attacks,

because financial support and material aid are fungible.  *See Kilburn v. Socialist People's Libyan*

*Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004).  Plaintiffs must show proximate cause.

*Selig,* 573 F. Supp. 3d at 61.

"Proximate cause requires some reasonable connection between the act or omission of the

defendant and the damage which the plaintiff has suffered."  *Owens,* 864 F.3d at 794.  To

establish a "reasonable connection," Plaintiffs must show both that "the defendant's actions

[were] a substantial factor in the sequence of events that led to [their] injury" and that their injury

"must have been reasonably foreseeable or anticipated as a natural consequence of the

defendant's conduct."  *Id.* (cleaned up).  In explaining its findings about causation, the Court

mirrors the same structure as in its findings of fact:  it begins with the "complex" attacks, then

discusses the EFP attacks, and finally turns to the IED, RPG, and small arms attacks.

*The "complex attacks"*:  Recall that several attacks involved multiple weapons systems,

were sustained over a long time, and required great advanced planning—leading Pregent to label

them as "complex."  *See supra* II.D.1 (discussing Attacks #1, 3, 15, and 16).  Attack #1 involved

terrorists attacking a vehicle convoy in an area with "machine gun rounds, RPGs, and a daisy

chain of IEDs."  *See* Hr'g Tr. at 73–74.  And the IEDs were "spread out so they hit at different

points of the convoy" allowing them to "basically annihilate three to five vehicles based on their

distance." *Id.* at 73.  Pregent testified that this attack was also an "ambush" because terrorists would have developed intelligence about U.S. troop movement to carry it out successfully.  *See id.* at 74.  Similarly, Pregent classified Attacks #3, 15, and 16 as "complex attacks" based on how long terrorists sustained them and the multiple weapons systems involved.  *See* Hr'g Tr. at 100–05, 122–23; Pregent Rep. at 23, 29–30.

Pregent thoroughly explained how Iran provided the training and weaponry to its proxies necessary to carry out these complex attacks.  *See supra* II.A–C.  Pregent also noted that Attacks #1, 15, and 16 were so sophisticated that only AQI could have carried them out at the time because other militias were not yet operating with this level of strategy, accuracy, or coordination.  *See* Hr'g Tr. at 74–76; 104–05.  And Pregent explained that he could attribute Attack #3 to AAH based on the complex tactic, location, and timeframe.  *See id.* at 122–23.

The Court is persuaded that Iran's support of AQI and AAH was a "substantial factor" in Attacks #1, 3, 15, and 16 and that the consequences of its support were "reasonably foreseeable." *Owens*, 864 F.3d at 794.  Plaintiffs have therefore shown proximate cause for these attacks. *Accord Est. of Doe v. Islamic Repub. of Iran*, 808 F. Supp. 2d 1, 8–9 (D.D.C. 2011) (reasoning that the complexity of the attack, including the weapon and planning involved, revealed Iran's involvement).

*The EFP attacks*:  Recall that several attacks involved EFPs, a signature weapon of Iran identifiable by its copper plating.  *See supra* II.D.2 (discussing Attacks #2, 4, 11, 17, and 18). Courts in this district have found proximate cause satisfied when EFPs were recovered at the scene because they could not have been produced without Iranian expertise and there is evidence that Iran was providing them to its proxies.  *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 26–29.  More, the speed with which various militia groups deployed EFPs as countermeasures to U.S. forces

34

increasing the armor on their vehicles suggested centralized Iranian direction.  *See id.* at 29.

Indeed, Pregent testified that Iran trained its proxies on how to effectively plant and deploy

EFPs.  *See, e.g.*, Hr'g Tr. at 28; *see also Karcher*, 396 F. Supp. 3d at 29.  The Court is persuaded

that Iran's support was a "substantial factor" in the EFP attacks and that the consequences of its

support were "reasonably foreseeable."  *Owens*, 864 F.3d at 794.  Thus, Plaintiffs demonstrate

that Iran was responsible for the EFP attacks.  *Accord Karcher*, 396 F. Supp. 3d at 30

("[I]dentification of the weapon as an EFP *all but* necessitates the inference that Iran was

responsible.").

*The IED, RPG, and small arms fire attacks*:  Typically in FSIA cases brought in this

district, courts have before them complex attacks such as Attack #1, *see, e.g.*, *Est. of Doe*, 808 F.

Supp. 2d at 8–9, signature weapons such as EFPs, *see, e.g.*, *Karcher*, 396 F. Supp. 3d at 26–30, a

terrorist group publicly claiming responsibility for the attack,[9] *see, e.g.*, *Force*, 464 F. Supp. 3d

at 339, or a nation celebrating its support of the group that led the attack, *see, e.g.*, *Borochov*, 589

F. Supp. 3d at 33.

The Court lacks any comparable evidence for the IED, RPG, and small arms fire attacks

that injured some Plaintiffs here.  So the Court pressed Pregent at an evidentiary hearing as to

---

[9]  Pregent acknowledged that terrorist groups tend to claim responsibility publicly and proudly
for attacks against Americans.  *See* Hr'g Tr. at 148.  And he conceded that even when a lone
wolf commits an attack, terrorist groups sometimes take credit for it.  *See id.* at 149. None did so
here for any of the IED, RPG, or small arms attacks.  *See id.* at 148–149; *see generally* Pregent
Rep.  But Pregent explained that simply because Iranian proxies did not take responsibility for
these attacks does not defeat causation.  *See* Hr'g Tr. at 149–50.  This is so because Shia militias
like AQI like to claim responsibility for attacks when they had video evidence of them.  *See id.*
The groups could then post videos to social media promoting their group and insert "Allahu
Akbar" after the killing or injuring of American soldiers.  *See id.* at 150.  Perhaps because these
attacks were not caught on film, Iran's proxies did not publicly claim responsibility for them.
*See id.* at 148–50.

how it could find Iran liable for attacks involving isolated IEDs, RPGs, and small arms fire.  The Court now finds that Plaintiffs have met their burden to demonstrate causation for all but Attack #25, which is really a series of disparate attacks over the course of a yearlong deployment that lacks a signature weapon.  *See supra* II.D.3.

*First,* the IED attacks.  *See supra* II.D.3 (discussing Attacks #5, 6, 7, 10, 12, 14, 19, 20, 21, 23, and 26).  Pregent explained that IEDs are themselves sophisticated weapons systems that a rogue terrorist could not deploy on his own without training.  *See* Hr'g Tr. at 50–51, 151.  Pregent explained that to successfully deploy an IED, proxy groups had to be trained on how to emplace and trigger them (either through command or passive detonation).  *See id.* at 50, 151.  As Pregent noted, the AQI manual and training camps taught proxy groups how to operate such weapons.  *See id.* at 51, 151; *see also* Ex. 112 (AQI manual), ECF No. 97-2.  More, he discussed how various terrorist militias needed to amass intelligence about U.S. routes to place IEDs where they were likely to inflict casualties on American troops, rather than on the terrorists or their sympathizers.  *See* Hr'g Tr. at 51.  Pregent explained that the group to which he attributed each attack had primacy in the relevant region at the time the attack occurred.  *See supra* II.D.3.  And for some he analyzed other SIGACTs in the region where similar attacks occurred to see which group was committing most of the destruction in an area.  *See id.*

Based on Pregent's report and testimony at the hearing—which showed careful study of the servicemen's declarations, areas where the attacks took place, SIGACTs in the region, and more—the Court is satisfied that Iran's support was a "substantial factor" in the IED attacks and that the consequences of its support were "reasonably foreseeable."  *Owens*, 864 F.3d at 794; *accord Fissler v. Islamic Repub. of Iran*, No. 18-cv-3122, 2022 WL 4464873, at *1, 3 (D.D.C. Sept. 26, 2022) (finding Iran liable for IED attacks in light of Iran's arms transfers, training

programs, and signature tactic of burying IEDs in the ground); *Neiberger v. Islamic Repub. of Iran*, No. 16-cv-2193, 2022 WL 17370239, at *4 (D.D.C. Sept. 8, 2022) (report and recommendation finding Iran liable for an IED attack in Sadr City), *adopted by* 2022 WL 17370160 (D.D.C. Sept. 30, 2022).

　　*Second,* the RPG attacks, some of which also involved small arms fire. *See supra* II.D.3 (discussing Attacks #8, 9, 13, 22, 24, and 25). Pregent noted that RPGs are a "highly sought-after weapons system" for militias and AQI. *See* Hr'g Tr. at 66. If a terrorist has an RPG, it was likely found in a weapons cache stocked by Iran. *See id.* at 67. And Pregent explained that like EFPs and IEDs, RPGs also require specific training to use. *See id.* at 66–68. In other words, if a terrorist group deployed an RPG accurately, "it means [they have] been trained on it." *Id.* at 66. More, Pregent explained that the basis for his attribution did not hinge on the use of an RPG alone. He also looked to which group controlled the region where and when the attack occurred. *See* Hr'g Tr. at 67–68; *see also supra* II.D.3. Pregent concluded that all of the relevant controlling groups in the regions where the attacks took place were also supported by Iran through training or direct provisions of weapons or soldiers. *See supra* II.A–C, II.D.3.

　　Based on Pregent's report and testimony at the hearing—which displayed careful study of the servicemen's declarations, who controlled the territory where the attack took place, SIGACTs in the region, and more—the Court is satisfied that Iran's support was a "substantial factor" in the RPG and small arms attacks other than #25 and that the consequences of its support were "reasonably foreseeable." *Owens*, 864 F.3d at 794; *accord Stearns v. Islamic Repub. of Iran,* No. 1:17-cv-131, 2022 WL 4764905, at *44, 53 (D.D.C. Oct. 3, 2022) (finding Iran liable for small arms and rocket attacks).

But the Court does not have enough information to find liability for Attack #25, which is really disparate attacks over a yearlong period. *See* Decl. of GG ¶ 6. Recall that Plaintiff GG served in the Kunar and Nuristan Provinces to secure the terrain, train Afghan locals in military and defense tactics, and provide security to Afghan locals and contractors repairing roads from August 2007 to August 2008. *See id.* During his deployment in these provinces, he claims that various individuals armed with RPGs, rockets, mortars, and small arms attacked him. *See id.* But he does not specify even the approximate months or locations where these attacks occurred. Nor does he tie them to a particular mission against AQI or another Iran-affiliated group as other soldiers have. *See, e.g.*, Decl. of AA ¶ 5; *see also* Pregent Rep. at 26 (soldier was on a route-clearing mission when an IED exploded and injured him). And he does not reference a signature weapon such as an EFP. Overall, the evidence for Attack #25 is more general than the rest of Plaintiffs' evidence (indeed, even GG's own evidence for Attack #26, during which he was also injured).

Consider Attack #17, which also provides few details. But Plaintiff W specifies a city (Mosul) and provides a three-month period when multiple bomb detonations injured him. *See* Decl. of W ¶ 5; Pregent Rep. at 30. And W explains that he was injured by an EFP. *See* Decl. of W ¶ 5. Though both W and GG claim multiple attacks over a period of time, W provides the Court with more evidence of Iran's involvement. W barely provides enough information to sustain a default judgment; GG does not.

True, Pregent attributed the attacks against GG to Taliban fighters trained and supplied by the Quds Force based on their primacy in the area. *See* Pregent Rep. at 36; Hr'g Tr. at 132–33. But he acknowledged that he could not search for SIGACT reports or other information about these attacks given the yearlong period. *See* Hr'g Tr. at 137–38. Pregent conceded that

"ideally" he wants "the perfect date/time group and location" when making an attribution to a particular terrorist group. *Id.* at 138.  And Plaintiffs' counsel similarly conceded at a second evidentiary hearing that he understands the Court's concern about finding liability for disparate acts over a yearlong period in the absence of a signature weapon. *See* Tr. of Second Evidentiary Hr'g at 25.  But he did not provide more evidence. *See id.*  The Court in no way diminishes the adversities that GG faced during his yearlong deployment nor questions the debt this Nation owes him for his service.  But without more specific information, the Court cannot find that he has met his burden on causation for Attack #25, even in the default judgment posture. *Accord Lee*, 518 F. Supp. 3d at 488 (declining to grant default judgment to two plaintiffs because of insufficient evidence).

## B.     Personal Jurisdiction

Next up is personal jurisdiction.  Personal jurisdiction over a foreign state exists whenever a court has subject matter jurisdiction and a plaintiff has effected service as required in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."  28 U.S.C. § 1608(a)(1).  The second is "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2).  Next, a plaintiff can effect service "by sending a copy of the summons and complaint and a notice of suit . . .  by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state

concerned." *Id.* § 1608(a)(3).  And finally, if none of the first three methods works, a plaintiff

can serve the documents through the Department of State.  *See id.* § 1608(a)(4).

The first two methods for serving were unavailable to Plaintiffs.  No special arrangement

governs service of process between the United States and Iran, and Iran is not party to an

international convention on service of judicial documents.  *See Borochov*, 589 F. Supp. 3d at 34.

Plaintiffs therefore tried to serve under § 1608(a)(3) by requesting the Clerk of the Court to mail

the summonses and Complaint to Iran via the Postal Service.  *See* Cert. of Mailing, ECF No. 17.

Iran did not appear or otherwise acknowledge receipt, so Plaintiffs asked the Clerk of the Court

to effect service through the U.S. Department of State.  *See* Aff. Requesting Foreign Mailing,

ECF No. 33-1 at 3.  The State Department served Iran in October 2020 through diplomatic

channels.  *See* Letter from the Clerk of the Court (Oct. 28, 2020), ECF No. 37.  This was

sufficient.  *Selig*, 573 F. Supp. 3d at 62.

Because the Court has subject matter jurisdiction and Plaintiffs properly served Iran, the

Court has personal jurisdiction over it.

## C.      Plaintiffs Have Properly Alleged Causes of Action

The FSIA provides plaintiffs with a private cause of action.  *See* 28 U.S.C. § 1605A(c).

This cause of action holds foreign state sponsors of terrorism and their employees or agents

liable for "personal injury or death" to nationals of the United States.  *Id.*  "This cause of action

is available to Plaintiffs because they are nationals of the United States and, given the overlap

between the elements of this cause of action and the terrorism exception to foreign sovereign

immunity," the availability of this claim has already been determined by the Court's subject

matter jurisdiction analysis.  *See Foley v. Syrian Arab Repub.*, 249 F. Supp. 3d 186, 205 (D.D.C.

2017).

Though the FSIA provides a private cause of action, it does not "provide the substantive basis for plaintiffs' claims." *Ewan v. Islamic Repub. of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020). Plaintiffs need to "prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered." *Oveissi v. Islamic Repub. of Iran*, 879 F. Supp. 2d 44, 53–54 (D.D.C. 2012) (cleaned up). Courts should "rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel v. Islamic Repub. of Iran, et al.*, 892 F.3d 348, 353 (D.C. Cir. 2018).

The servicemembers bring a count for injury, but they do not allege a theory of liability for this count. *See* Compl. ¶¶ 385–89. Courts seldom deny a plaintiff who fails to properly articulate a theory of liability provided the plaintiff has alleged the necessary elements for a theory of liability. *See Rimkus*, 750 F. Supp. 2d at 176 ("The Court . . . will not exalt form over substance . . . The fact that plaintiff does not expressly set forth a prototypical common law cause of action will therefore not defeat his claim for relief.").

Courts in this district have applied assault and battery theories of liability to attacks like the ones in this case. Iran is liable for assault if, "when it committed extrajudicial killing or provided material support and resources therefor, (1) it acted 'intending to cause a harmful contact with . . . or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 21(1)). Iran intended to cause harmful contact and apprehension of that contact because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010). The servicemembers

have submitted substantial documentation of the harm Iran caused them and the fear they experienced during these attacks.  The Court finds that Iran is liable for assault.

Iran is liable for battery if "when it committed extrajudicial killing or provided material support and resources therefor, it acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'"  *Murphy*, 740 F. Supp. 2d at 74 (quoting Restatement (Second) of Torts § 13).  "Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'"  *Id.* (quoting Restatement (Second) of Torts § 15).  As has been explained, Iran intended to cause harmful or offensive contact.  And all servicemembers stated in their declarations that in at least one of the attacks they faced they experienced harmful contact.  Thus, Iran is liable for battery.

The family members bring a claim for solatium.  *See* Compl. ¶¶ 390–93.  Solatium is "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort."  *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018) (cleaned up).  Under the FSIA, solatium claims are indistinguishable from claims of intentional infliction of emotional distress (IIED).  *See Valore,* 700 F. Supp. 2d at 85.  Courts have applied the Restatement (Second) of Torts to these claims.  *See, e.g.*, *Abedini v. Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019); *Est. of Hirshfeld*, 330 F. Supp. 3d at 140.

The Restatement sets out four requirements for an IIED claim:  Iran must have (1) engaged in extreme and outrageous conduct, (2) which was directed at persons other than plaintiffs, (3) which intentionally or recklessly caused severe emotional distress, (4) to plaintiffs'

immediate family members who were present when such conduct occurred.  *See* Restatement

(Second) of Torts § 46.

   The family members satisfy all four requirements.  They meet the first and third

requirements because "acts of terrorism are by their very definition extreme and outrageous and

intended to cause the highest degree of emotional distress."  *Est. of Hirshfeld*, 330 F. Supp. 3d at

141–42 (cleaned up).  They meet the second requirement because the conduct was directed at the

servicemembers, not the family members.  And they meet the fourth requirement because

Plaintiffs are immediate family members of the servicemembers.  *See* Compl. ¶ 74 (X Family),

¶ 99 (A Family), ¶ 115 (C Family), ¶ 124 (D Family); ¶ 139 (F Family); ¶ 150 (G Family); ¶ 161

(H Family); ¶ 182 (J Family); ¶ 191 (K Family); ¶ 200 (L Family); ¶ 207 (N Family); ¶ 216 (M

Family); ¶ 225 (AA Family); ¶ 234 (EE Family); ¶ 277 (Y Family); ¶ 303 (O Family); ¶ 312–13

(R Family); ¶ 340 (Z Family); ¶¶ 353–54 (GG Family); ¶ 374 (Q Family).  The requirement that

immediate family members be present at the time of the attack has been waived when the

attackers were terrorists.  *Est. of Hirshfeld*, 330 F. Supp. 3d at 141 ("[A]cts of terrorism are

sufficiently extreme and outrageous to demonstrate that they are intended to inflict severe

emotional harm on even those persons who are not present during the act.").  The family

members have thus established Iran's liability under the federal private right of action for their

solatium claims.

## V.   CONCLUSION

For these reasons, the Court will grant in part Plaintiffs' Motion for Default Judgment. But the Court denies the motion as to Attack #25 involving Plaintiff GG because it does not provide enough evidence to find Iran liable.


Dated: January 17, 2023                    TREVOR N. McFADDEN, U.S.D.J.